**STATE of Missouri, Respondent,**

v.

**Richard Joseph CROSSMAN, Appellant.**

**No. 55141.**

Supreme Court of Missouri,
Division No. 2.

March 8, 1971.

John C. Danforth, Atty. Gen., Dale L. Rollings, Asst. Atty. Gen., Jefferson City, for respondent.

Robert M. Wohler, St. Louis County Public Defender's Office, Clayton, for appellant.

FINCH, Judge.

This is an appeal from a judgment and sentence of imprisonment for fifteen years imposed by the trial judge under the Second Offender Act (§ 556.280, V.A.M.S.) after a jury had found defendant guilty of assault with intent to do great bodily harm with malice aforethought to Mrs. Kristene Harris (§ 559.180, V.A.M.S.). We affirm.

Prior to trial, defendant filed a motion to suppress any in-court identification of him by Mrs. Harris on the basis that he had been viewed by Mrs. Harris in a confrontation at the police department without benefit of counsel and under circumstances so fundamentally unfair as to violate his constitutional rights and vitiate any in-court identification by the witness. An evidentiary hearing was held outside the presence of the jury. In support of his motion, defendant testified that on the morning of August 8, 1968, he had been arrested by police officers on two traffic charges and on a charge of possible assault, after which he was taken to the Third District Police Station. He was not questioned, but without anything being said to him about a lineup and without any advice as to his constitutional rights, he and other prisoners, lined up in a hall preparatory to being transferred to the Central Station, were observed by Mrs. Harris and two detectives. One of the latter pointed him out to the woman and said, "There goes Richard Crossman, is he the one," and she replied, "I think so." The detective then said, "Book him." On cross-examination, the defendant, over objection, was asked about three prior convictions. This was done by the State on their claim that they had a right to attack his credibility in connection with his testimony on the motion to suppress.

The State offered on the motion the testimony of Mrs. Harris and of Sergeant Nelson, which was as follows: At about midnight on the evening of August 7, 1968, Mrs. Harris, a resident of Shrewsbury, Missouri, was walking in her neighborhood when she heard a car approaching from behind slow its speed and then someone in the car inquired if she wanted to ride. She ignored the remark and continued walking. The car kept even with her and the question was repeated. Again she ignored the question and kept walking. She then heard the car stop and someone get out and start to follow her. Mrs. Harris was between eight and nine months pregnant at that time and could not run. She continued to walk but at the intersection of Murdock and Danbury she turned and faced the person following her, telling him he had better get away as she was going to the police station. He replied that he wasn't doing anything and only wanted to ask her if she wanted to ride, but she didn't answer. Mrs. Harris had started to turn and walk on, but she then again faced the man to repeat that she was going to the police station, but in a loud, harsh voice which sounded as though he were angry, he said, "You didn't answer me, you stupid broad," and then grabbed her around the neck. The man had his hands around Mrs. Harris' neck with his thumbs at the front of her throat, with the result that she couldn't breathe.

There were street lights in the area and there was a street light at the intersection. Mrs. Harris was face to face with the man for perhaps two minutes and testified that she could see his face clearly.

Later, at the police station, the officers observed big red blotches and bruises on Mrs. Harris' neck, which remained sore for about a week.

After the man grabbed Mrs. Harris and began to choke her, he then began to push her back off the street and onto an adjacent lawn toward a tree where the area was dark. Finally, Mrs. Harris managed to get out a loud yell or scream. The man then released her and started back down

the street toward his car. There were automobiles coming up the street by then and Mrs. Harris flagged the first one, telling the driver, Gary Zander, that a man had tried to choke her and asking him to please go back up the street and get the license number off of the car. Zander did so, after which he took Mrs. Harris to the Shrewsbury Police Station. She reported the occurrence to Sergeant Nelson and gave him the license number of her assailant's car. She also described the man as being about her height (5′8″), thinly built, young (in his 20's), with light brown hair and a short haircut. He was cleanly shaven and not badly dressed. She had never seen him before.

The next morning, the police ascertained that the license number reported to them by Mrs. Harris and Gary Zander had been issued to the defendant. He thereafter was arrested.

On the morning of August 8, Sergeant Nelson brought some police photographs to the home of Mrs. Harris where he told her that he had photos of possible suspects which he wanted her to look at. He told her to be very careful that she was sure of identification before stating that she knew someone in the photos, but if anyone looked familiar, she should designate him. Sergeant Nelson did not tell her to pick anyone out. There were six photos which she examined. Sergeant Nelson said nothing while she was doing so. She picked out either the fourth or fifth photo in the stack as the one who had grabbed her. Thereafter, Sergeant Nelson told Mrs. Harris the man's name and mentioned something of his previous record. He also told her that the license number on the car at the scene reported by her to the police had been issued to the man whom she had picked out.

Later that morning, Sergeant Nelson called Mrs. Harris and told her that they had someone at the station he thought she should look at. He didn't mention Crossman at that time, nor was he mentioned or discussed as they drove to the police station. She testified that she was not told that Crossman was in the group she was to see, but the officer did explain to her something about lineups.

At the police station, Mrs. Harris was placed in a chair fifteen or twenty feet away from a hallway where five or six men were lined up. (The Third District Station had no show-up room.) The men in the hall were all about the same age group and all average in height. Sergeant Nelson did not tell Mrs. Harris anything about the men and she did not hear any conversation by the men in the group. As they walked along the hallway, Mrs. Harris looked at them and she picked out the last one, tapping Sergeant Nelson on the shoulder and telling him that the last one was the person who had attacked her. The officer then went out into the hallway and asked that man his name and received the reply that it was Richard Crossman. He then was booked for this assault.

After the hearing on the motion to suppress and a discussion between the court and counsel regarding the lineup cases, including United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149, the court then made the following order: "Based on the evidentiary hearing and the law which has been presented, it is the Court's finding and belief that we do not have the situation here which is set forth in the United States versus Wade and therefore the motion to suppress is overruled."

Thereafter, during the trial, the judge further indicated that one ground or consideration for his action in overruling the motion to suppress the in-court identification was the fact that photographs had been shown to Mrs. Harris, distinguishing the case from the lineup cases on which the defendant was relying.

At the trial, the State offered about the same evidence from Mrs. Harris and Sergeant Nelson except that it offered no evidence with reference to the lineup at the

Third District Police Station. The trial court had informed counsel earlier that he would not permit any testimony as to the police station lineup. In addition, Gary Zander testified that he had come along the street that night, was flagged down by Mrs. Harris, that he obtained the car license from the red, two-door sedan stopped up the street, and then took Mrs. Harris to the police station, where the incident was reported by Mrs. Harris and the car license from the car which was being driven by the assailant was reported to the police. Defendant did not testify and he offered no evidence at the trial.

■ While it would have been desirable for the trial court to be more specific as to his reasons for overruling the motion to suppress and to have stated, if in fact he so found, that the in-court identification of defendant had an independent basis, we conclude from the record that as a matter of fact this is what the trial court did. We also find that the trial court was justified in admitting the in-court identification by Mrs. Harris on the ground that it had a basis independent of the informal lineup confrontation. The record shows that Mrs. Harris viewed the defendant for two minutes in good light at the time of the incident, clearly observing his whole face at that time. Immediately thereafter she described the defendant to the police department and there is no claim or intimation that said description was inaccurate. When shown photos the next morning of persons of comparable size and age, she picked out the photograph of the defendant. The use of photographs under such circumstances is permissible. Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247. The trial court mentioned and relied upon the fact that Mrs. Harris, before the time of the informal lineup, had viewed photographs of several men and had picked out the defendant. He considered the lineup cases, held that Wade was distinguishable, and on that basis that the in-court identification would be permitted; but he would not allow evidence as to the lineup itself. On this record, we hold and determine that the in-court identification had an independent basis. State v. Mentor, Mo., 433 S.W.2d 816; State v. DeLuca, Mo., 448 S.W.2d 869; State v. Williams, Mo., 448 S.W.2d 865. We observe, incidentally, that the accuracy of her identification is substantiated by the fact, not known to her when she picked out defendant's photograph, that the car driven by assailant at the scene was registered in defendant's name.

Furthermore, this was a pre-indictment or pre-information lineup and we have held that the rule of Wade is not applicable in such a situation. There is considerable authority to support that position. See State v. Walters, Mo., 457 S.W.2d 817, and cases therein cited. Apparently, the trial court did not rule the case on this basis but rather on the ground that the in-court identification had an independent basis. Under our decisions, the trial court's ruling is sustainable on either or both of these grounds.

■ Defendant's second point is that the trial court should have sustained his objections to the entire jury panel based on voir dire examination of the jury panel which developed the fact that Judge Douglas L. C. Jones had made certain allegedly prejudicial remarks to all jurors in the jury panel room that morning. We find no merit in this contention. Defense counsel was permitted to interrogate the jurors on the voir dire examination with reference to this subject. The only things developed in that connection were mentioned by three members of the jury panel. One juror said that Judge Jones "mentioned that eyeball witnesses can be broken down or something comparable to that." He did not recall any further explanation by Judge Jones of that remark, and he said, "I think the inference was that two witnesses can have opposing testimony and it is difficult to determine which is accurate." Another juror recalled, in answer to inquiry as to remarks of Judge Jones, "a point about a man being accused of a

crime and having two trial dates set and for some reason not wanting to go to trial." He remembers nothing else about it. A third juror recalled a comment "about the wheels of justice turning very slowly and that the slow pace was perhaps not speeded up by the custom of continuances occurring perhaps to the point where witnesses who were available at the first —at the beginning of a trial were no longer available as time went by." He said that he did not recall that Judge Jones placed the blame on any individual group or parties. He did recall that Judge Jones remarked on the fact that there was a backlog of trials that had accumulated and that there would be extra time devoted to jury trials that coming summer as compared with past summers. He did not recall any comments as to either the prosecuting attorney's office or his assistants or as to defense lawyers. All of these jurors indicated that the remarks would not affect them and that they would decide the case on the basis of the evidence and the law.

In discussion between counsel and the court outside the hearing of the jury, the suggestion was made that if defense counsel desired to pursue this matter further, it should be outside the presence of the jury, and that perhaps Judge Jones should be questioned as to what was said, but defense counsel did not pursue that and as a matter of fact subsequently indicated, after the court had overruled this motion and also had overruled the motion to suppress the in-court identification, that he had discussed the matter with the defendant and that the defendant did not want to delay the trial and did not want to renew his objection to the entire panel. However, in any event, we see nothing in what was said that would have provided any basis for quashing the entire panel or which would in any wise have prejudiced the defendant's trial.

■ The third point raised by defendant is alleged error in receiving into evidence Exhibits 1–A through 1–F, which were the six photographs exhibited to Mrs. Harris by Sergeant Nelson the morning after the incident in question. Defendant's objection is that these photographs informed the jury that defendant had been arrested previously and charged with a crime. The record shows that the trial court directed that a tape be placed over the photographs blocking out that portion of the photograph giving information as to arrests, serial number, etc. Defendant contends that, even so, it invites the jury to engage in guesswork and speculation as to defendant's previous criminal record. The trial court held that the photographs were admissible with the tape placed over the objectionable portion of the photographs. In so holding, the court was relying on the cases of State v. Childers, Mo., 313 S.W.2d 728, and State v. Holmes, Mo., 389 S.W.2d 30. Those cases do approve the introduction of photographs or pictures. Where, as here, the defendant is challenging the identification of him by the State's witness, the introduction of the photographs helped the jury to determine the accuracy or inaccuracy of the identification made by the witness. The objectionable portions of the photographs were blocked out so as not to be visible to the jury, and we conclude that the admission of the photographs was not prejudicial error. A recent case so holding is State v. Hatcher, 277 N.C. 380, 177 S.E. 2d 892. See also annotation on subject in 30 A.L.R.3d 908, and State v. Rima, Mo., 395 S.W.2d 102.

Defendant's fourth point is that the evidence was insufficient to show an assault with intent or purpose of inflicting great bodily harm with malice aforethough as required for a conviction under § 559.180, V.A.M.S., and hence defendant's motion for judgment of acquittal should have been sustained.

■ We overrule this contention. An assault involving use of the hands can be sufficient to support a conviction under § 559.180, V.A.M.S., even though a weapon was not used. State v. Spradlin, 363 Mo.

940, 254 S.W.2d 660; State v. Gillespie, Mo., 336 S.W.2d 677; State v. Buckhanan, Mo., 416 S.W.2d 166; State v. Mathis, Mo., 427 S.W.2d 450. In this case the evidence as to the attack wherein defendant grabbed her around the neck and placed his thumbs on her throat so as to choke her and keep her from breathing, resulting in big red splotches and bruises and a soreness of her neck for the following week, the harsh words directed to her, and defendant's action in shoving her back toward the dark area near a tree on the lawn until she managed a scream and caused him to leave, were sufficient to permit the jury, under proper instructions, to determine the issue of whether the assault was in fact with intent to do great bodily harm with malice. Defendant relies on Buckhanan, supra, but the facts therein are not comparable. There the defendant simply put his arm around a victim's neck during the course of a robbery in order to hold him. The victim admitted he was not injured and there was no evidence that the defendant strangled the victim or attempted to inflict any great bodily harm.

The fifth point is that Instructions 1 and 2 were erroneous in that there was a fatal variance between them and the information on which defendant was tried. More specifically, this complaint is that the information used the words "strike, beat and wound," whereas the instructions use the words "strike and choke."

▮ The information herein advised defendant that he was charged with making an assault on Mrs. Harris with his hands, a force likely to produce great bodily injury or death, and that he did so feloniously and with malice aforethought. It recited additional detail in that this assault by his hands was accomplished by striking, beating and wounding Mrs. Harris. The instructions submitted the same basic issue to the jury of whether the defendant made an assault on Mrs. Harris with his hands with intent to do great bodily harm and with malice aforethought. They also submitted whether the assault by the hands was by striking and choking instead of utilizing the words from the information, namely, "striking, beating and wounding." However, a variance, to be fatal and hence to justify reversal, should be material and prejudicial to the rights of the accused. Supreme Court Rules 24.11, 26.04, V.A.M.R.; §§ 545.030 and 546.080, V.A.M.S. The variance here was not of such a character. It is difficult to see wherein this defendant would have been misled or prejudiced in any way by reason of the variance in the words used in the information and in the instructions in describing the assault by the defendant by utilization of his hands. The basic offense charged and submitted is the same, and unless the defendant can be said to have been prejudiced in that he would have been better able to defend had the information contained the phrase "strike and choke," he should not be entitled to relief on account of the variance.

The cases of State v. Lusk, Mo., 452 S.W.2d 219, and State v. Swiggart, Mo., 458 S.W.2d 251, are cited and relied on by defendant to support his position. In Lusk the indictment charged defendant with murder committed by beating the deceased. At the trial the State submitted the case to the jury on the question of whether the murder was caused by beating *or* exposure. Exposure was not alleged in the information and was an entirely different means of producing death as contrasted with death resulting from an assault by beating. Hence, the case was reversed. In Swiggart, a companion case, the information was amended to include conjunctively the element of exposure as a means of murder, but there was error in the submission by the instruction in that the case was submitted disjunctively with reference to assault by beating *or* exposure, and there was no evidence to support a submission as to the assault.

We hold that the variances between the instructions and the information of which defendant complained were not prejudicially erroneous.

Finally, defendant urges that the court should have sustained his motion for mistrial as a result of an inquiry from the jury concerning a verdict form for common assault and the note the trial judge sent in response thereto. The note from the jury read: "The 4 forms which we have been given of possible verdict include a form which indicates the possibility of finding Mr. Crossman guilty of Common Assault. None of the members of the jury are aware of any instructions concerning this particular verdict. Max Deutch, Foreman." In response thereto, the judge sent a note telling the jury as follows: "The jury should disregard the verdict form for common assault. It was inadvertently given to you and is not before the jury for your consideration." Counsel for the defendant collaborated with the prosecuting attorney and the court in drafting the reply, and stated at the time that he thought it was the best possible answer, but nevertheless he moved for a mistrial for the inadvertent inclusion of the verdict form for common assault.

We are unable to see wherein this occurrence would have prejudiced the defendant in any way. Obviously, the verdict form was surplusage since the trial court had not instructed the jury on common assault and the court therefore properly told the jury to disregard that verdict form.

In connection with this contention, the defendant also asserts that the court should have instructed the jury on common assault as a lesser included offense. A proposed instruction on common assault was tendered by the defendant but refused. The court instructed on assault with intent to do great bodily harm without malice aforethought (under § 559.190, V.A.M.S.) as well as such assault with malice aforethought. The jury found defendant guilty of the more serious offense. Defendant is saying the court also should have instructed on common assault. We conclude that under the evidence in this case, the court

was not required to give such instruction. State v. Surgeon, Mo., 456 S.W.2d 293.

The judgment is affirmed.

All of the Judges concur.