**STATE of Missouri, Respondent,**

v.

**Michael Archie JONES, Appellant.**

**No. KCD 27647.**

Missouri Court of Appeals,
Kansas City District.

Dec. 8, 1975.

Thomas M. Larson, Public Defender, Cenobio Lozano, Jr., Asst. Public Defender, Kansas City, for appellant.

John C. Danforth, Atty. Gen., Richard E. Vodra, Asst. Atty. Gen., Jefferson City, for respondent.

Before SWOFFORD, P. J., and WELBORN and HIGGINS, Special Judges.

SWOFFORD, Presiding Judge.

Defendant was convicted of Robbery First Degree on trial by jury and was sentenced to fifteen (15) years imprisonment. He raises four points upon this appeal. *First,* he asserts that the trial court erred in overruling his motion to suppress the testimony of the victim of the robbery of pretrial and in-court identification of the defendant because the pretrial photographic identification was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification and thereby tainted the subsequent in-court identification. *Second,* he urges that he was denied a fair trial because the court, over his objection, admitted "mug shot" photographs of the defendant and one Reginald Woodruff into evidence and permitted these to be passed to the jury. *Third,* he claims that his conviction was obtained by false testimony given by Patrolman Wright, coupled with the knowing misrepresentation by the prosecutor to the jury as to the character of such testimony. *Fourth,* he asserts that the trial court denied him the effective exercise of his Sixth Amendment right to cross-examine adverse witnesses.

A resolution of these points requires a somewhat detailed summary of the evidence. From this evidence, the jury could reasonably have found the following facts:

On August 5, 1974, Brenda Robinson, also known as Brenda Fleeks, and her husband, Tommy Robinson, and their small daughter occupied an eighth floor apartment in the Wayne Miner housing project, 912 Euclid, Kansas City, Missouri. At approximately 12:30 a. m. on that date, Tommy Robinson and one Charles Tony, who had been visit-

ing in the apartment, left to go to a nearby store, leaving Brenda and the child alone in the apartment.

Approximately 15 minutes later, Mrs. Robinson heard a knock on the front door, looked through an observation hole therein and saw a young girl at the door. She also saw a man, Reginald Woodruff, known to her and whose grandmother occupied an apartment on the eighth floor of the building, standing at the elevator door, four feet from her entrance, holding the elevator door open. Upon Mrs. Robinson making inquiry of the girl as to her business there and being advised that the girl wished to see Mr. Robinson, she opened her apartment door to permit the girl to enter. As the door was opened, four or five men rushed into the Robinson apartment. These men were brandishing pistols and wore women's stockings over their heads, mask-fashion. Woodruff, who was not wearing a mask, remained at the elevator.

One of the men held a gun to Mrs. Robinson's head, forced her down a hallway to a bathroom, where she and her daughter were restrained (Mrs. Robinson with her hands taped behind her) during the course of the robbery, a period of about 30 minutes.

Mrs. Robinson was acquainted with the defendant; he had been in the Robinson apartment about an hour before the robbery for about 20 minutes; at that time he was dressed in red plaid pants and an orange jacket; and she knew him by the name of "Monk". At the time the men rushed into her apartment, the ceiling light in the front room, with four light bulbs, was turned on and she recognized the defendant both facially (despite the stocking mask) and by reason of his dress during the approximate ten seconds before she was taken to the bathroom at gunpoint.

After the men left the apartment, she went to the bedroom window overlooking the project parking lot, illuminated by a "big old huge spotlight", and saw the defendant and other males coming out of the apartment building carrying her television and stereo sets, which they placed in the trunk of a car in which they then departed. When she saw defendant in the parking lot, he was not wearing a stocking mask or anything over his face.

Upon the arrival of the police, Mrs. Robinson told Patrolman Wright that one of the persons who had burst into her apartment and robbed her she knew as "Monk".

When Mr. Robinson and his friend Charles Tony were leaving the elevator of the building on their trip to the store at about 12:15 a. m., he ran into his "friends", Michael Jones (Monk) and Reggie Woodruff, and seveal other men. He had known the defendant about two months, having met him through Reggie Woodruff, both of whom had visited the Robinson apartment about an hour before this incident.

At about 1:45 p. m. in the afternoon of April 5, 1974, Mrs. Robinson went to police headquarters to view some photographs. Either before or after looking at these photographs,[1] she was told that Monk's real name was Michael Jones. She was shown four "mug shots" and she identified one of these as "Monk" and another as Reggie Woodruff. She did not recognize the other two persons. There was no attempt on the part of the police to exert any influence or suggestions as to which of the four photographs (or that any one of them) was that of Michael Jones or "Monk", or that the police engaged in any other impermissible activity with reference to this identification.[2]

1. She testified both ways during the course of this proceeding.

2. Defendant claims that the police segregated the two photographs *prior* to Mrs. Robinson's identification and thus engaged in im-

permissible suggestions. This claim is not supported by the record to any persuasive degree, however, as will be hereafter demonstrated. While the testimony of Mrs. Robinson on the hearing on the motion to

The jury could have reasonably found (and did find) the foregoing facts from the evidence offered by the state. However, these findings find further support from the testimony of the defendant, who took the witness stand in his own defense.

He testified in detail as to his activities on April 4, 1974, and the early morning of April 5, 1974. A substantial part of this time was spent in the company of Reggie Woodruff. He further stated that he had been acquainted with Mr. and Mrs. Robinson for several weeks prior to April 4–5, 1974, and that he had been in their apartment four or five times before that night. He stated that he and Reggie (and others) had visited the Robinson apartment at about 11:15 p. m. on the night of the robbery; that he and Reggie later returned to 912 Euclid at about 12:00–12:15 a. m. in order to pick up a jacket that Reggie had left at his grandmother's apartment on the same floor as the Robinsons; that at this time the defendant tried to visit his brother (who lived on the 9th floor) but found he was not at home; and, that he and Reggie then returned to the apartment of another friend at 3310 Woodland at about 12:45 a. m., where he slept for several hours. The defendant denied that he was dressed as described by Mrs. Robinson or that he was implicated in any way in the robbery. He thus sought to establish an alibi, as above noted, that he was at 3310 Woodland at the time of the robbery and that Mrs. Robinson's identification of him was wrong.

During the course of defendant's testimony, he admitted that he had previously been convicted for "stealing from a person" for which he had served time. Other evidentiary facts and trial incidents necessary to the resolution of the points raised by the defendant will be hereafter noted.

■ Relying upon *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) defendant's first point on appeal deals with the photographic identification of him by Mrs. Robinson and his claim that such was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification and thereby tainted her in-court identification. *Simmons* holds that such a claim "must be evaluated in light of the totality of surrounding circumstances." In Missouri, when so viewed, the determination of whether or not pretrial identification was "impermissibly suggestive" is governed by three cardinal principles. Consideration must be given to (1) the presence of an independent basis of identification; (2) the absence of any suggestive influence by others; and (3) positive courtroom identification. *State v. Boothe*, 485 S.W.2d 11, 13[2] (Mo. banc 1972); *State v. Parker*, 458 S.W.2d 241, 243–244[2] (Mo.1970); *State v. Murphy*, 508 S.W.2d 269, 274[1] (Mo.App. 1974).

■ In applying these criteria to the facts in the case at bar, the record presents, at the outset, an unusual circumstance. Mrs. Robinson was not robbed by a stranger but by a "friend"—at least, a person with whom she and her husband had been acquainted for several weeks; a person who admittedly had visited the Robinsons apartment on four or five occasions; and, whose last visit had been made about an hour before the robbery. This is not the usual situation where a victim is seeking to identify a stranger, a person theretofore unknown to her, and whose physical characteristics and appearance were not familiar to the victim prior to the crime. Further, Mrs. Robinson testified that she saw the defendant with the other intruders in her home, in a well-lighted room, for about ten seconds; that she recognized him as "Monk" despite the stocking mask; and, that she later saw him unmasked in a well-lighted parking lot helping to load her sto-

suppress, with respect to one answer, might be given such strained construction, it is clear from her written statement of April 5, 1974 (T. 16/17) and her positive testimony

at the trial (T. 104/105) that the segregation occurred *after* she viewed the four photographs.

len TV and stereo into an automobile. The first criteria was amply met. Mrs. Robinson had an independent basis for her identification of the defendant.

Neither is there any substantial evidence that Mrs. Robinson's pretrial photographic identification of the defendant was induced by any improper influence or suggestions of the police or others. The defendant's claim to the contrary is apparently based upon three contentions. *First*, the fact that Mrs. Robinson told the police that one of the men who robbed her was known to her as "Monk" and that the police told her that "Monk" was Michael Jones, the defendant. This was obviously merely conversation linking the nickname to the real name and there is no evidence that the police told her that a specific photograph, or that any of the photographs shown to her, was a picture of "Monk" or Michael Jones. *Second*, the defendant claims that before the identification the police segregated or separated the photographs of the defendant and Reggie Woodruff and that Mrs. Robinson thereafter made her identification from two, rather than four, photographs. Mrs. Robinson plainly and clearly testified that she made her identification from four photographs. Defendant seeks support for his contention in this regard from the testimony of Mrs. Robinson at the hearing on the motion to suppress which followed her testimony that she was shown four photographs from which she identified the defendant and Reggie Woodruff, which thus appears, under questioning by defense counsel:

"Q. All right. When he (police officer) showed you the two photographs—he separated the two photographs, did he not, from the other two?

A. (Nodded head in affirmative.)

Q. He did, didn't he?

A. Yes."

However, a close scrutiny of the "totality" of Mrs. Robinson's testimony at both the hearing on the motion to suppress and the trial compels the conclusion that such separation was made *after* and not *before*

her identification of the defendant and Woodruff, and that her foregoing testimony referred to the general occasion or time when she was at the police station and not to a specific time prior to her photographic identification of defendant. This conclusion is inevitable because after her identification of the photographs a written statement was taken from her by Detective Grosko. This statement was introduced as an exhibit by the defense at the trial of the case. During the cross-examination of Mrs. Robinson, the following appears:

"Q. Now, in your statement also there is a question which reads, 'Mrs. Fleeks, I am showing you two mug shots *which you looked at earlier together with other pictures*, and asking (sic) you if these are the two men you recognized during the robbery.' You were shown two pictures at that time, weren't you?

A. I was shown four.

Q. All right. But I mean *at the time that he was asking you* on this one you were shown two photographs?

A. Yes." (Emphasis supplied)

It is clear from this record that any separation of the photographs of the defendant and Woodruff from the other two occurred after she had made her identification and while her written statement was being taken.

*Third*, the defendant claims in support of his first point that the police informed Mrs. Robinson upon this occasion that Woodruff was known to them and that he and the defendant were associates with bad records. Here, once again, nothing in the record shows that the passing of this gratuitous information to Mrs. Robinson was in any way connective with or had any influence upon her identification of the photographs of the defendant and Woodruff. As previously stated, she knew them both and was aware of their association with one another, and the information that they had "bad records" was not shown to have resulted in

any misidentification. It is clear that no improper or impermissible suggestions or influence appear from this record.

Lastly, the third criteria of the Missouri rule is met by the clear, positive, unequivocal and untainted in-court identification of the defendant by Mrs. Robinson, based upon independent sources, "even though the (pretrial) procedure employed may have in some respects fallen short of the ideal." *Simmons v. United States, supra* (88 S.Ct. at l. c. 972); *State v. Crossman,* 464 S.W.2d 36, 40[1] (Mo.1971).

The defendant's first point is ruled against him.

■ The second point raised by defendant relates to the admission into evidence and the showing to the jury of the two police photographs or "mug shots" of the defendant and Reggie Woodruff. The photograph of the defendant had been cropped so that the police department's identification number and other data did not appear, but the photograph of Woodruff had not been altered or masked in any way. These photographs were identified, offered, admitted into evidence over the objection of defendant, and passed to the jury as part of the state's direct examination of the victim, Mrs. Robinson. Defendant claims that this was fatally prejudicial to him and that thus he was denied a fair trial. In so doing, he places his principal reliance upon the cases of *United States v. Harrington,* 490 F.2d 487 (2nd Cir., 1973) and *Barnes v. United States,* 124 U.S.App.D.C. 318, 365 F.2d 509 (1966). Neither of these decisions is authoritative here and each is clearly distinguishable on the facts. Both of these decisions were based upon the rationale that to permit the introduction of "mug shots" of a defendant, who had not taken the witness stand in his own defense, was in ultimate effect permitting the prosecutor to show prior criminal convictions. *Harrington* clearly recognized a sharp division in the federal circuit opinions on this subject and held that each case must be determined upon the totality of the circumstances of

that case. Strong dissents were filed in both *Harrington* and *Barnes.* But resort need not be had to the federal circuit court's opinions for a resolution of the problem here presented. The Supreme Court of Missouri has clearly and positively laid down the guidelines controlling and dispositive of this point.

Preliminary to a brief discussion of these authorities (and at the risk of undue repetition) it should be recalled that the defendant, throughout the trial and here upon appeal, stoutly challenges the identification of him by Mrs. Robinson; he claimed an alibi; and, he took the witness stand in his own defense.

In the case of *State v. Holmes,* 389 S.W.2d 30 (Mo.1965), the defendant, convicted of a robbery of a donut shop, challenged the identification of him by two employees of the shop and presented evidence of an alibi. His photograph (apparently not a police photograph) was admitted into evidence and error was asserted upon that ground. The court ruled that such photograph was "relevant and material on the question of the accuracy of his identification by the witness." (l. c. 34[5]). See also, *Robertson v. State,* 464 S.W.2d 15, 19–20[5, 6, 9] (Mo.1971), which apparently involved the use of a "mug shot"; *State v. Crossman,* 464 S.W.2d 36, 41[3] (Mo.1971), wherein "mug shots" of defendant, upon which the police data had been masked, were held to be admissible.

Each of the above authorities cites and relies upon the decision in *State v. Childers,* 313 S.W.2d 728 (Mo.1958) which is dispositive of this point. In *Childers,* the defendant was charged and convicted of robbery of a tavern. The bartender and several customers identified the defendant and one Allen as the participants in the robbery. These "mug shots" of both defendant and Allen with the police data on the front thereof were shown to the witnesses at trial, identified by them and introduced in evidence. This was asserted as error for the reasons that the photographs were "im-

material and irrelevant and did not tend to prove or disprove any issue in the case and no foundation [was] laid or later connected as to the origin of said pictures, and said pictures were prejudicial and numbers were across [each] picture." Childers did not testify but did offer alibi evidence.

In ruling the above allegation of error against Childers, the court said (l. c. 731[5]):

" * * * Throughout the trial defendant was seeking to establish that he was not the person who participated in the robbery. He sharply challenged the identification of him from the photographs shown to the witnesses at the police station and the personal identification of him after he was taken into custody by the police. The presence of the defendant in the courtroom and the viewing of his photograph by which the State's witnesses identified him as a participant in the robbery made it possible for the jury to determine the accuracy or inaccuracy of their identification of him from the photograph shown them on July 29th. The identity of Allen, whom the evidence showed defendant admitted to have been present and wounded at the robbery, made their joint identities relevant and material. No error was committed in their admission."

In the case at bar, the defendant sought to establish that he was not the person who participated in the robbery. The defendant's presence in the courtroom and a viewing of his photograph from which Mrs. Robinson identified him as a participant made it possible for the jury to determine the accuracy or inaccuracy of her identification of him from the photographs shown her at police headquarters.

The identity of Woodruff, a person whom the evidence shows (1) to have been present at the time and place the robbery occurred; (2) to have been in the company of the defendant during the time of the robbery and during the day immediately preceding the robbery; and (3) to have been with the defendant in the robbery victim's apartment for ten to fifteen minutes an hour before the offense was committed, made defendant's and Woodruff's joint identities relevant and material.

■ In ruling this point against defendant, we also note that he took the stand at his trial and admitted, on direct examination, that he had previously been convicted of a felony. The defendant cannot now complain that the introduction of his photograph into evidence disclosed to the jurors a fact which he himself chose to reveal to them.

Defendant's second point is ruled against him.

The defendant's third point (without citation of authority other than the Fourteenth Amendment to the United States Constitution) is rather obscure and tenuous. In essence, it would appear to be based upon the charge that Officer Wright gave "false" testimony; that the prosecutor thereafter knowingly misrepresented to the jury the character of such testimony and that such facts did not become known to defense counsel until after the jury began deliberations.

■ While the actions and rulings forming the basis of this charge cannot be gleaned from the defendant's stated point [which therefore fails to comply with the mandate of Rule 84.04(d)] it appears from a study of the argument portion of the defendant's brief and the transcript that the charge of perjury against Officer Wright and the charge of knowing misrepresentation against the prosecutor are based upon the following trial incidents.

On direct examination of Officer Wright, he stated that he responded to the police call at the home of the victim. The following appears:

"Q. And did she give her name as Brenda Fleeks Robinson?

A. Yes, she did."

On cross-examination, the following appears:

"Q. Now, you testified in answer to the question by the prosecuting attorney that Brenda Fleeks told you her name was Brenda Fleeks Robinson?

A. Yes, I did.

Q. But on your report you have 'Brenda Fleeks'.

A. I must have made a mistake."

After a noon recess and a conference with the prosecuting attorney, Officer Wright was recalled "for further direct examination" and this interrogation by the prosecutor appears in the transcript:

"Q. Will you tell this Court and jury what that conference was about?

A. Okay. One of the earliest questions that he asked me was did the victim state her name was Brenda Fleeks Robinson, and I responded yes. Automatically when I said this I knew that I had made a mistake. She at no time told me her name was Brenda Fleeks Robinson, just Brenda Fleeks * * *

* * * * * *

Q. And would you tell this Court and jury whether or not during the recess I confirmed that a mistake had been made in your testimony?

A. Yes, we (sic) did.

Q. And at my direction did you volunteer to come back on the stand and clarify that mistake?

A. Yes, I did."

In the second part of his closing argument to the jury, the prosecuting attorney stated:

"* * * Now, I thought that officer [Wright] was overwhelmingly true. He even came back here and told you he had made a mistake."

Defendant's brief charges that by the statement in his argument the prosecutor "submits the *lie* as a *mistake* to the jury and tells them that the *liar* is an *honest man* who volunteered to come back to correct a *mistake*." (Emphasis supplied)

■ Despite these intemperate and unacceptable positions, it is clear that this whole matter hinges around a name variance of the victim. There is not the slightest evidence to show that Brenda Fleeks was some person other than Brenda Robinson. In fact, the contrary conclusively appears. Brenda Robinson's maiden name, before her marriage to Robinson in 1971, was Fleeks; the apartment which was the scene of the robbery was leased in the name of Fleeks; and, there was some indication that Mrs. Robinson was drawing child welfare payments in the name of Fleeks. This record affords absolutely no basis for the violent charge of perjury against Officer Wright and of knowing misrepresentation to the jury against the prosecutor. From these fine representatives of the state, truthfulness, rather than falsity, honesty, rather than deceit, candor, rather than subterfuge, emerge convincingly from this record.

■ On this point, the defendant attached to his motion for a new trial the affidavit of a Certified Law Intern who assisted in the defense of this case under Rule 13. By this document the defendant sought to establish that during the noon recess preceding the recall testimony of Officer Wright, the prosecutor stated to the trial court, in chambers, that he wished to recall Wright "to correct some false testimony" and that during the deliberations of the jury the prosecutor in informal courtroom conversation stated that he had "confronted" Wright with this "false testimony"; that Wright had at first refused to resume the stand to correct this testimony; and, only "relented" when the prosecutor told Wright that otherwise the state would have to dismiss the case. While under the facts in this record this unsupported affidavit taxes credulity, at best it might be dignified as newly discovered evidence. As such, even if true and admissible, it would fall far short of constituting evidence so material that it would probably produce a different trial result, within the clear Missouri rules as reaffirmed in *State v. Harper*,

473 S.W.2d 419, 421[1] (Mo. banc 1971). It all related to a name variance of the victim of the robbery, was immaterial, collateral and unimportant.

■ The defendant further complains that he was not granted an evidentiary hearing on this facet of his Motion for a New Trial and was thus denied due process. Without deciding whether he would have been entitled to such a hearing, a simple and conclusive answer to this complaint is that he did not request a hearing from the trial court but was apparently content to rest upon the affidavit above referred to, which was attached to his motion. See, *United States v. Price*, 464 F.2d 1217, 1219[5] (8th Cir. 1972), cert. den. 409 U.S. 1040, 93 S.Ct. 522, 34 L.Ed.2d 489; *State v. Lay*, 427 S.W.2d 394, 402[6] (Mo.1968).

The emphasis here devoted to this point is engendered not from either its actual or intrinsic importance to, or judicial impact upon, the merits of this appeal, but rather from a real concern that the sole basis for the specious reason upon which it rests is the affidavit of a law student acting as a Certified Law Intern associated with the defense under the provisions of Rule 13. One is compelled to wonder why the Public Defender, if he was determined to burden the trial and appellate courts with this type of matter, did not assume this burden himself. No such wonder or doubt, however, can exist as to the indelible fact that the fine and salutary purposes of Rule 13 were not served thereby.

The defendant's third point is ruled against him.

The defendant's fourth (and last) point (again, without citation of authorities) is that the trial court denied him the "effective right to cross-examination of adverse witnesses." Here again, he has failed to comply with the mandatory provisions of Rule 84.04(d), but a gratuitous and close scrutiny of the argument portion of his brief and of the transcript of the trial reveals that this point is based upon two trial incidents, neither of which compels corrective action by this court.

■ *First*, during defense counsel's cross-examination of the robbery victim, Mrs. Robinson, he produced a woman's stocking and asked her if the stocking masks worn by the robbers were "like this". Mrs. Robinson denied the similarity to the ones used by the men who robbed her. The trial court thereupon sustained objections to further use or reference to the stocking produced by defense counsel in court; it was not marked as an exhibit nor further identified; no offer of proof was made; and, this stocking is not part of the record in this court. The trial court's ruling in this regard was not error.

The stocking produced by counsel was obviously intended as demonstrative evidence and, in the face of the victim's denial that it was the same as the stockings worn by the robbers, it did not meet the tests of relevancy, materiality or probative force required of this type of evidence. It could not give the jury a more accurate impression of the facts, or throw any light upon any material matter, nor was it in any way identified as connected with the offense or with the defendant. *State v. Miller*, 364 Mo. 320, 261 S.W.2d 103, 106–107[4] (1953); *State v. Aubuchon*, 394 S.W.2d 327, 333[8] (Mo.1965).

■ *Second*, the state was permitted to recall Tommy Robinson, the victim's husband, as a rebuttal witness. He had testified when called as a witness initially that the man who had been visiting in the Robinson apartment and with whom he left to go to the store about 15–20 minutes before the robbery was named Charles Tony. Mrs. Robinson in her testimony described this man as a friend of her husband, who lived on the ninth floor of the apartment project and whose first name was "Tony" and whose last name she did not know.

Here again, the record reveals a mix-up in names. Tommy Robinson was called by the state to clarify this and to reiterate the fact that his friend's name was in fact

"Charles Tony". While this was not strictly rebuttal evidence, since it was on a basically immaterial point, and defense counsel had ample opportunity to cross-examine Tommy Robinson when he originally testified, it does not appear that the defendant was prejudiced by any restriction on his cross-examination during the so-called rebuttal testimony of Robinson. Moreover, counsel for the defense did not make any offer of proof, request that he be permitted to extend his original cross-examination of Robinson, or otherwise advise the court of his purpose, objectives or intentions.

Defendant's fourth point is ruled against him.

The judgment is affirmed.

All concur.