**STATE of Missouri, Respondent,**

v.

**Robert Lucious TONEY, Appellant.**

**No. KCD 26815.**

Missouri Court of Appeals, Kansas City District.

May 3, 1976.

Motion for Rehearing and/or Transfer Denied June 1, 1976.

Frank A. Anzalone, Asst. Public Defender, 21st Judicial Circuit, Clayton, for appellant.

John C. Danforth, Atty. Gen., W. Mitchell Elliott, Asst. Atty. Gen., Jefferson City, for respondent.

Before TURNAGE, P. J., and WELBORN and HIGGINS, Special Judges.

ROBERT R. WELBORN, Special Judge.

By a six-count indictment in the St. Louis County Circuit Court, Robert Lucious Toney was charged as follows:

Counts I and II—Murder in the first degree.

Counts III and IV—Assault with intent to kill with malice.

Counts V and VI—Robbery in the first degree with a deadly weapon.

On a jury trial in the Boone County Circuit Court on change of venue from St. Louis County, the jury found defendant guilty on all six counts and fixed his punishment as follows:

Counts I and II—Life imprisonment.

Count III—Two years' imprisonment.

Count IV—Jury unable to agree on punishment.

Counts V and VI—Five years' imprisonment.

In sentencing the defendant, the trial court ordered the sentences on Counts I and II to run consecutively. He fixed the punishment on Count IV at twenty years' imprisonment. The sentences on Counts III, IV, V and VI were made concurrent with each other and consecutive to the sentences imposed on Counts I and II. The defendant

appeals from the judgment and sentence on Counts I, II and IV.

At around 1:20 A.M., March 18, 1972, St. Patrick's Day festivities at Cousin Hugo's Tavern, a neighborhood tavern located in Maplewood on Laclede Station Road at Edgebrook, were interrupted when five young black men, armed with pistols, sawed-off shotguns and a knife entered and announced a holdup. The one armed with a knife jumped on the bar, then behind it where he demanded the money in the cash register from the barmaid, Sandra Clemens. She took the money from the cash register, put it in a bag and gave it to the intruder who then stabbed her in the abdomen.

Two of the intruders went to the back room of the tavern where 25 to 40 customers were dancing. The customers were ordered to lie on the floor and throw their wallets and purses on the floor. Similar orders were given customers in the front part of the tavern. The customers complied with the orders.

While the robbers were gathering up the customers' belongings, a whistle blew and one of them shouted: "Police." The robbers started to leave by the front door of the tavern. As one was leaving, he turned and fired a sawed-off shotgun toward the customers lying on the floor in the front of the tavern. The shot from the blast struck Owen Kelly in the thigh. He was also shot in the knee with a .38 caliber revolver. The robber with the shotgun then turned toward John Gallino, an off-duty Crestwood police officer, and shot him in the head from 1½ feet.

After the robbers had left, police were called and an officer arrived at the scene within a few minutes. Mrs. Clemens and Kelly were taken to the hospital. They recovered from their wounds. Officer Gallino was pronounced dead on arrival at a hospital from a gunshot wound to the head. Another customer, John Hagerty, had been found on the floor, bleeding profusely from the abdomen. He too was dead on arrival at the hospital from a stab wound.

On March 18, a resident of Edgebrook, the street which ran alongside the tavern, told investigating officers that he had seen Robert Lucious Toney, whom he had known as a fellow student in high school, driving an automobile with three or four other black passengers, turn off Laclede Station Road onto Edgebrook between 5:00 and 5:30 P.M. the previous day. The witness also recognized one of the passengers, Louis Jones, whom he had also known in school. The witness's attention was drawn to the auto and its passengers because Edgebrook is a dead-end street with three houses on it in a white neighborhood.

On the basis of this information, police sought out Toney and located him at a residence on Banneker, rented by Toney and his sister. Toney came to the door when an officer knocked, identified himself and acceded to the officer's request to take a look in the house. Upon entering the house, the officer discovered three other black males, two of them in a room in which he saw what appeared to be a shotgun lying on the floor. Upon this discovery the officer placed Toney and the three other persons in the house, Louis Jones, Christopher Davis and Theodore Johnson, under arrest for murder and robbery. Search of the premises after the arrest produced a bag containing billfolds and purses taken from customers at Cousin Hugo's. Numerous weapons were also found on the premises. The four men and a fifth, James Hill, arrested subsequently in the City of St. Louis, were charged in the Cousin Hugo's case.

On this appeal, there is no challenge to the sufficiency of the evidence to support the verdicts against appellant. At his trial, several customers identified appellant as one of the robbers who was in the back room of the tavern, carrying a sawed-off shotgun. One customer identified Toney as the man who fired twice with a shotgun as the robbers were leaving the tavern. A barmaid identified Hill as the person who fired the shotgun at that time. Kelly, the customer whose shooting was the basis of the charge of assault under Count IV, identified Toney as one of the robbers but could not identify the person who shot him. Bal-

listics evidence connected weapons found at the Banneker house with spent shell casings found at the tavern. Officer Gallino's pistol was also found at the Banneker house.

### Ruling on Motion to Suppress

The defendant moved to suppress as evidence "wallets, credit cards, firearms and pieces thereof, knives, and other items seized from the premises known as 1338 Banneker * * *." The motion alleged that the search of the premises and seizure of the items were made without a warrant, that his arrest was without probable cause, that the search and seizure were not incident to a lawful arrest and that defendant did not consent to the search and seizure.

A hearing on the motion produced the following evidence. Appellant and his sister, Beverly Telfair, were co-renters of the house at 1338 Banneker. Sergeant Boulch of the St. Louis Police Department was a member of the Major Case Squad which was called in to investigate the Cousin Hugo's case. He, along with two other officers, Sergeant Bradley and Patrolman Sanders of the Maplewood Police Department, was assigned the duty of checking out the information furnished by appellant's former classmate that he had seen appellant and several other young black males in the vicinity of Cousin Hugo's at around 5:00 P.M., March 17. The officers went to 8301 Dumas, the address of appellant obtained from a school yearbook in the possession of the informant. They arrived there around 8:30 A.M., March 18. Sergeant Boulch approached the front door of the house where an elderly black woman was talking with a man. Boulch identified himself as a police officer and asked: "Is Lucious here?" The woman completed her dealings with the man who left. She became highly upset and started hollering "Lucious, Lucious." She backed into the house and Boulch followed her into the house, where he looked around and saw only some small children. He turned back toward the woman who "began immediately to scream and throw her arms around, and with that she ran from the house."

She ran into the street, continuing to shout "Lucious, Lucious, the police." She ran around the corner on Banneker, continuing to shout, until she stopped in front of 1338 Banneker. The defendant appeared on the front porch and Sergeant Boulch approached him, showing his badge and identification.

"* * * I said, 'I am Sgt. Boulch. What is your name?' He said, 'Lucious Toney,' and I said, 'Do you live here?' And he says, 'Yes, I do.' And I said, 'Who do you live here with?' He said, 'My sister.' I said, 'Who is here now?' He said, 'Some gal.' I said, 'Would you mind if I take a look?' And he said, 'No.' And with this I proceeded into the house, and I was on my guard the entire time, watching as I was walking into the house. I walked into the living room and he was proceeding towards the doorway, directly in front of me. As I got to this doorway, I heard footsteps coming behind me in sort of a run, and [Toney] stated, 'No, some guys.' And with this he run past me, and I immediately went after him. And he ran through, well, what was a bedroom off of the living room, and then into the kitchen, and then into—the left, towards another room. As I was proceeding into the kitchen after him, I observed somebody run into the bathroom, at which time I ran up behind [Toney], and he was standing there looking into this other room. He had the door partially open.

\* \* \* \* \* \*

"* * * leaning into the room, and with this I pulled the door open, and I looked into the room, and I saw two other Negro male subjects, and something caught my attention, and I looked towards the floor, and alongside of the bed at what appeared to be a shotgun, and I immediately drew my revolver and hollered to Sgt. Bradley, and I said, 'Watch it, Bill, these are the guys.'

\* \* \* \* \* \*

"* * * I said, 'Watch the bathroom. There is someone in there.' I don't know where Sgt. Bradley was, but I hollered loud enough that he could have heard me, and with this I pushed Toney into the room, and

put my revolver on him, and told all of the others, 'You are under arrest for robbery and murder. Put your hands up.' And with this I walked into the room toward the subjects, * * *."

Not knowing whether the fourth person who had gone into the bathroom had been apprehended, Sergeant Boulch moved around the wall of the bedroom in order to get out of the doorway. As he moved toward a dresser he was on the lookout for weapons. The top dresser drawer was open enough for him to see a pistol in it. (This weapon, later seized, was identified at the trial as Officer Gallino's service revolver, and placed in evidence.) Boulch ordered the three men out of the bedroom into the kitchen where Sergeant Bradley had the fourth person in custody. As they went to the kitchen, Boulch noticed a bulge on the back of the person nearest to him (Davis). Boulch grabbed for the object and found it was a holster, with no weapon in it.

The four black males were handcuffed together in the kitchen. Boulch directed that a call be made for other officers to assist and shortly they appeared on the scene. Sergeant Boulch directed that a search of the house be made to "make sure that we have got everybody." He looked into the bedroom where he had placed the three men under arrest and noticed a black beret on the floor. One of the five robbers had been reported to be wearing a black beret at Cousin Hugo's. Boulch found a pistol under the beret. He replaced the beret on top of the weapon.

Boulch then went to the bathroom where the fourth person had been arrested. He noticed a pile of what appeared to be dirty clothing, large enough to conceal a person. He started to move the clothing aside and as he did so, a green plastic bag on the top fell off the pile. Boulch grabbed it and looked inside it. He saw women's purses, a billfold and credit cards. At some stage of the affair, Sergeant Boulch discovered that what he saw on the floor of the bedroom when he first looked in and thought was a shotgun were sawed-off butt portions of two shotguns.

The defendant and the other three persons were taken to police headquarters for booking. St. Louis County police identification personnel arrived at the Banneker address and at Boulch's direction photographed the gun butts, the weapon in the dresser drawer, the beret on the floor with the weapon under it, etc. After the objects had been photographed, they were seized by police.

Detective Kallbrier of the Bureau of Identification participated in the photographic work. After the pistol had been photographed in the dresser drawer, he removed from the drawer a beret, money and some shells. He found the bottom drawer of the dresser removed when he entered the bedroom. Lifting a cover from it, he found a knife, two sections of a shotgun barrel, a cartridge belt, gloves and a hacksaw. These items were seized, as well as the contents of the two other dresser drawers. Kallbrier and his partners took possession of the green plastic bag and its contents. They also took a spent .38 shell and a spent shotgun shell from a kitchen waste basket.

As the police gathered at the scene, so did a crowd of black persons who began banging on the walls of the house and shouting. Some made assaults on police officers and tried to push into the house. Sergeant Boulch became apprehensive that the crowd posed a threat to the safety of the officers and the preservation of the evidence. The officers thereupon withdrew, removing the various items which they had discovered.

The following day, at around 10:00 P.M., three members of the Major Case Squad went to the Banneker house. Ms. Telfair was there and signed a consent to search of the premises. They conducted a thorough search, in the course of which they found three sawed-off shotguns under a shelf covering the bathtub plumbing.

The circuit court found that Sergeant Boulch had probable cause for the arrest of defendant; "that thereafter because of 'the inherent necessities of the situation at the time of the arrest' (the house was a small shack; guns and parts thereof were everywhere; Sgt. Bolch (sic) at this time thought

that he was alone; and there were four suspects) and shortly thereafter that (an unruly crowd gathered) the police officers had the right to search the said premises. *Chimel v. California,* [395 U.S. 752] 89 S.Ct. 2034 [23 L.Ed.2d 685]. The Court further finds that the second search was valid because of a valid consent by one of the co-tenants."

Appellant has briefed first the question of whether or not the search could be justified on the ground of appellant's consent. The trial court did not rely on consent to the first search. If its conclusion that the search was incident to a valid arrest is supported, the issue of consent is immaterial, except insofar as the consent of appellant did permit the officer to enter the house and thereby gave legality to the presence there of Sergeant Boulch. See *State v. Gailes,* 428 S.W.2d 555, 558[2] (Mo.1968).

Appellant contends that the facts and circumstances known to Sergeant Boulch did not constitute probable cause for the arrest of appellant and his companions. Appellant does not argue this contention at length and has offered a single citation in support of his contention; *Henry v. United States,* 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959). Aside from its statement of the well-established general principles governing the validity of an arrest without a warrant, the case is of little assistance. It is clearly distinguishable on its facts, involving, as it did, an inadvertent discovery of evidence of another crime after what the court found to have been an arrest for a different offense. Here the police knew of the offense involved; they knew that at least five persons were involved in the crime; that the perpetrators were young black males (a fact which distinguishes this case from the case of *State v. Deffenbaugh,* Mo.App., 534 S.W.2d 565, decided in this court on March 1, 1976); that appellant and several young black males had been seen in the vicinity of Cousin Hugo's late in the afternoon before the occurrence (an operation such as that involved at Cousin Hugo's might reasonably be expected to have involved some prior "casing"); that appel-

lant's mother's behavior was, to say the least, strange when she learned that police were searching for Lucious; that, although defendant admitted Boulch without question, he obviously had lied to the officer about who was in the house; that appellant and three black males were in the house in a room that appeared to contain a shotgun; that Toney, after having admitted him, seemed anxious to divert the attention of Sergeant Boulch from the room in which the men were.

Viewing these circumstances as a whole, this court cannot say that the trial court's finding of reasonable cause for the arrest was erroneous. " * * * Of course, all the information in the possession of the officers and all reasonable inferences therefrom are pertinent to determine probable cause. Whether there is justification for probable cause to arrest without warrant must be determined by practical considerations of everyday life on which reasonable men act and is not to be determined by hindsight by legal technicians. *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). The determination of probable cause depends upon the particular facts and circumstances of the individual case and no ready 'litmus paper test' can be applied. Probable cause may be based on hearsay. There is a broad gulf between what is required to prove guilt and the requirement of probable cause." *State v. Wiley,* 522 S.W.2d 281, 287[4–9] (Mo.banc 1975).

Having made a valid arrest, the officer had the right to seize evidentiary items in plain view. This would include the pistol under the beret as well as the pistol visible in the partially opened drawer.

Inasmuch as the arrests accounted for only four members of the five-man group which was involved in the case and inasmuch as the house bore all of the earmarks of being the headquarters of the group, the officers were justified in further search for the fifth person. This is not a case such as *United States v. Gamble,* 473 F.2d 1274 (7th Cir. 1973), cited and relied upon by appellant, in which two of three

persons involved in an offense had been previously arrested and in which the court held that upon the arrest of the third person, further search of the premises upon which the arrest occurred could not be justified on the theory of looking for other persons involved in the crime. Here, knowing that there was another participant not accounted for, the officers had the right to make a reasonable search of the premises to satisfy themselves that such participant was not on the premises, threatening their safety. *State v. McCollum,* 527 S.W.2d 710, 712 (Mo.App.1975). The investigation of a pile of clothing which might have concealed a man would have been justified. When it produced the plastic bag, containing rather obvious loot from the robbery, the officer was not obliged to ignore it.

■ A more difficult question is presented with respect to the contents of the covered bottom drawer of the dresser, uncovered by officers who arrived on the scene after the arrestees had been removed and the house, at least internally, secured. In *Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969), the Supreme Court, in limiting searches incident to an arrest to the person of the arrestee and the area "within his immediate control," stated:

"There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs— or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant. The 'adherence to judicial processes' mandated by the Fourth Amendment requires no less."

The state would justify the search of the covered drawer and the seizure of its contents on the "exigent circumstances" exception. See *State v. Wiley,* supra, 522 S.W.2d 290–292[18]. Although the trial court in its memorandum did not use that term, it seems apparent that it considered such exception applicable.

The evidence on the motion to suppress did show that a near riot situation developed outside the Banneker residence. Police officers familiar with similar occurrences were concerned for their safety and for the safety of the persons in the crowd. Based upon their experience they considered that the best way to disperse the crowd and avoid difficulty was to get away from the scene. The suggestion that the officers could have provided guards for the house while they sought a search warrant ignores the realities with which the officers were confronted. Such delay could well have provided opportunity for building up not only the size but also the resentment of the crowd. A finding of "exigent circumstances" was fully warranted and the trial court's conclusion in this regard was not erroneous.

■ Insofar as the search the following night is concerned, appellant offers no evidentiary basis for disregarding the officer's testimony that Ms. Telfair voluntarily assented to the search. Appellant contrasts the testimony of her cooperative behavior on that occasion with the testimony of her hostility at the time of appellant's arrest. Such a contrast does not compel disbelief of the officer's testimony.

Appellant does not contest that, as a cotenant, Ms. Telfair had the right to consent to the search. See *United States v. Matlock,* 415 U.S. 164, 171[2], 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

■ Two other matters should be noted in connection with this point. Appellant has stated in his brief that Officer Boulch, having been a St. Louis police officer, was outside the territorial limits of his authority in making the arrest in Richmond Heights. No such ground of objection was urged below and it will not be considered when raised for the first time on appeal. Appellant has also complained of the activities of Detective Brocksmith at the Banneker house, which produced a weapon which appellant says was identified as the weapon used in the shooting of Kelly. That weapon does not appear to have been offered in evidence in this case.

In summary, no error has been demonstrated in the trial court's ruling on the motion to suppress.

### *Validity of Indictment—Grand Jury*

Appellant moved to quash the indictment against him, based upon the following allegations:

"I.

"The process of selecting potential grand jurors is unconstitutional in that:

"A. That the selection of names for the grand jury wheel as designated in Section 498.290 R.S.Mo. to-wit:

"'The Circuit judges in general term shall select the names of six hundred persons, *known* or *believed* by *them* to be in every way *fitted* for grand jury service, . . .' [emphasis mine] is unconstitutional and violates defendant's rights under the equal protection and Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution in that:

"1. Nowhere does the constitutional requirement that said Grand jurors be selected from and reflect a cross-section of the community exist in Section 498.290 R.S.Mo.

"2. That said Statute permits the selection of a 'blue ribbon' panel composed of persons arbitrarily chosen for their positions in the community and relationship to the various Circuit Judges rather than their capabilities to be fair and impartial jurors, and representatives of a cross-section of the County.

"3. A random initial selection process is not incorporated in the Circuit Judges' selection of names to be placed in the Grand Jury Wheel.

\* \* \* \* \* \*

"III.

"A. The grand jury which returned said Indictment was discriminatorily selected and empaneled as applied to defendant, a Negro, in that:

"1. Negroes were systematically excluded from said grand jury;

"2. Even if said exclusion was not deliberate and systematic, it is inherent in the method of selection;

"3. The ratio of Whites to Negroes called for grand jury duty is significantly higher than the ratio of Whites to Negroes in St. Louis County;

"4. The ratio of Whites to Negroes selected for grand jury service is significantly higher than the ratio of Whites to Negroes in St. Louis County;

"5. The grand jury which indicted defendant in fact contained no Negro jurors;

"6. That competent and qualified Negroes now exist in said St. Louis County from which selection into said Grand Jury Wheel could have been ascertained upon the diligent efforts of said Circuit Judges.

"7. That said selection procedure has existed for a long period of time, to-wit, the systematic and arbitrary exclusion of all but a token few Negroes on said Grand Juries.

"8. That the impact of the selection process which results in the systematic exclusion of a class of persons such as Negroes [or all but a taken (sic) few] on any individual case is unascertainable; and that consequently any indictment returned by such a tribunal must be set aside.

"9. All of the foregoing matters were and are in violation of defendant's rights to Due Process and Equal Protection of the laws under the Fifth, Fourteenth and Fifteenth Amendments to the United States Constitution and Article I, Sections 2 and 10 of the Missouri Constitution."

This matter was submitted on the following stipulation:

"I.

"A. The names in the grand jury 'wheel', from which the grand jurors which returned the indictment in this cause were chosen, were placed therein as follows:

"1. Six hundred names are placed therein;

"2. Each of sixteen circuit judges places a pro rata share of the names therein, and a

few are added in the Grand Jury Association;

"3. Each judge selects the names which he places therein as he sees fit, and submits the names which he selects to the other circuit judges for approval;

"4. The most common sources of names for inclusion are:

"a. Persons personally known to the judges;

"b. Persons recommended to the judges by persons known to the judges;

"c. Persons recommended by civic and political organizations;

"d. Occasionally, persons who request service may be included.

"5. No judge has selected names by use of any county-wide list such as voter registration lists, county directory, or telephone books.

"B. When a new grand jury is to be selected, the process is as follows:

"1. A new grand jury is empanelled for each term of Court;

"2. Each new grand jury is empanelled by a different judge, in numerical rotation;

"3. The empaneling judge selects the number of names which he wishes to have drawn from the 'wheel';

"4. When a new grand jury is to be empanelled, a meeting of the Court *en banc* is called, a quorum being necessary, at which those members present take turns drawing names from the 'wheel' until the desired number have been drawn;

"5. The empaneling judge makes inquiry regarding the names drawn and selects twelve to serve; this is normally done by:

"a. Calling all or a portion of these whose names are drawn into court or chambers and talking with them;

"b. Sending telegrams to those drawn inquiring which wish to serve;

"c. Making telephone calls to those drawn and talking with them;

"d. Discussing the names drawn with the judges who placed them in the wheel.

\* \* \* \* \* \*

"III.

"A. The stipulations pertaining to I above are applicable herein;

"B. Some members of the Negro race are included in the 'wheel';

"C. Some of the judges specifically recall placing the names of Negroes in the 'wheel,' but some of the judges do not know or recall how many Negroes they have included;

"D. No record is kept of the race of the persons whose names are in the 'wheel';

"E. There is no method of ascertaining the number of Negroes whose names are in the 'wheel,' other than by personally contacting each of the persons whose names are therein;

"F. Negroes comprise approximately 4.4% of the population of St. Louis County;

"G. There are legally qualified Negroes in St. Louis County whose names are not in the 'wheel.' "

In *State v. Ramsey*, 355 Mo. 720, 197 S.W.2d 949 (banc 1946), the court held that a statutory scheme for selection of grand jurors, identical with that here involved, is not unconstitutional, and that if a defendant wishes to attack the validity of a grand jury selected in accordance with such system, he has the burden of establishing that in practice the system does result in discrimination. Proof of such a charge requires that the defendant "must adduce facts sufficient to establish a prima facie case of systematic exclusion of an identifiable class from jury service." *State v. Kelly*, 506 S.W.2d 61, 63[6, 7] (Mo.App.1974). Here the support for the allegations of appellant's motion must be found in the stipulation upon which the motion was submitted, and that stipulation does not show facts sufficient to make a prima facie showing of discrimination.

In these circumstances, this court is bound to follow *State v. Ramsey*, supra. The numerous federal authorities cited by

appellant have been considered, but none granted relief on a record barren of a showing of discrimination such as here found.

### Motion to Sever or to Require Election

■ Defendant filed a motion to sever the indictment and each count or alternatively to require the state to elect on which count it would proceed. The motion was overruled. Appellant asserts that this ruling was error and that the trial court was required, upon his motion, to order a severance of the offense. In support of his contention, appellant relies upon the concurring opinion of Judge Donnelly in *State v. Neal*, 514 S.W.2d 544, 550–551 (Mo. banc 1974), in which he concluded that amended Rule 24.04, permitting the joinder of offenses in a single indictment or information in certain circumstances, left unaltered the rule of *State v. Terry*, 325 S.W.2d 1, 5 (Mo.1959), "that a defendant may not be convicted at the same trial of two distinct felonies."

In the later case of *State v. Baker*, 524 S.W.2d 122, 126[4] (Mo. banc 1975), the court upheld the constitutionality of amended Rule 24.04 and held that trial of separate offenses in a single trial is permissible when authorized by statute or rule. A separate concurring opinion again stated that Rule 24.04 may not validly authorize multiple count trials. 524 S.W.2d 131–132. However, this court has no choice but to follow the majority view expressed in Baker. On the basis of that holding, the refusal to sever the indictment or to require an election was not error.

### Evidence on Crowd at 1338 Banneker

■ Appellant contends that the trial court erred in "permitting the state to portray the apparently hostile reactions of an all-Negro crowd outside 1338 Banneker * * *." Appellant contends that such evidence was irrelevant, prejudicial and injected racial issues into the trial.

As previously noted, the pretrial hearing on the motion to suppress did deal at some length with the hostility of the crowd that gathered at 1338 Banneker at the time of appellant's arrest. However, at the trial when the reference to the situation outside the house first arose, the court warned the state against the use of any language indicative of a "potentially riotous" situation. This warning followed defense counsel's statement that, based on a deposition, the witness (Officer Coons) was going to say he "observed a group of black persons in a potentially riotous situation." As a result of the court's direction, the officer stated merely (without objection) that "there was a large crowd" across the street. The witness also stated, without objection, that 10 or 12 police officers were in the area when he arrived and that more officers arrived later.

When, in the course of Officer Boulch's examination, defense counsel again objected that the officer was getting into the "so-called riot situation," the officer's testimony was limited to a statement that the officers left the house before the search was completed. No effort was made to go into the reason for the departure.

Without objection Officer Consolino testified that the officers were ordered to leave the house before completing their search. Major Lowery, the Commanding Officer of the Major Case Squad, testified, likewise without objection, that he gave the order for the withdrawal of the officers from the house before completion of the search. In neither case was anything said about the reason for the withdrawal.

Finally, when Major Lowery, in testifying to his visit to the house on the evening of March 18, when Ms. Telfair consented to the officers' search, stated that about 40 police officers accompanied him on the mission, as well as a police helicopter and two police cruisers in the vicinity. In response to this testimony, defense counsel moved for a mistrial which was denied.

The recital of the testimony relied upon by appellant on this assignment of error shows clearly that the testimony never was allowed to reach the dimensions which counsel feared in his original objection. The trial court did limit the testimony so

that no reference to a threat of a riot was made. There is simply no basis for the objection now voiced and no error has been demonstrated.

### Neutron Activation Analysis Evidence

■ On March 18, 1972, after appellant was in custody at the Maplewood Police Department, Robert Roither, a criminologist employed by the St. Louis County Police Department, processed the hands of appellant for the purpose of providing material for a neutron activation analysis to determine whether or not appellant's hands bore gunshot residue. Using a kit supplied by the University of Missouri Research Reactor Facility, Roither made separate swabs of the back and front of appellant's hands with Q–Tip cotton swabs dipped in diluted nitric acid. The four Q–Tips so used, along with a fifth which had, for control purposes, been only dipped in the acid solution, were replaced in separate vials, sealed and eventually delivered to the Research Reactor Facility on the campus of the University of Missouri at Columbia.

Dr. Matthew Eichor, a radio chemist at the Research Reactor Facility, received the swabs and testified to the procedures followed and the results obtained in their neutron activation analysis. Appellant's assignment of error on this appeal relates primarily to the admission of Doctor Eichor's testimony to the results of the analysis and, although numerous grounds of error in the admission of such testimony are argued in the brief, the one made at the trial and therefore properly preserved for review is that Doctor Eichor did not himself perform all of the steps involved in the analysis and that he had no personal knowledge pertaining to the steps performed by others.

The purpose of the analysis here involved was to ascertain the presence of antimony and barium on the hands of the person from whom the materials subjected to analysis have been taken. Barium and antimony are used in the primer-material of American made ammunition. The presence of such materials on the hand of a person may indicate that such person has recently handled or fired a weapon.

Such elements appear in gunshot residue in minute quantities, and neutron activation analysis is a procedure which has been developed for the determination of whether or not such elements are found in a test sample and the quantity thereof found. As explained by Doctor Eichor, the process here employed involved placing each of the swabs in a separate plastic container which is then placed in a nuclear reactor where it is subjected to atomic radiation. Various trace elements in the sample become radioactive as they absorb neutrons. The test sample is then removed from the reactor and processed chemically for the separation of the radioactive barium and antimony. In this process the swabs which were employed are destroyed. The radioactive barium and antimony are then placed in a detector with a multi-channel analyzer which analyzes and records the gamma rays emitted by the radioactive elements in the sample. The detector records an electrical pulse when gamma ray is detected in a crystal. A print-out supplies the number of pulses detected in the detector. Such results are compared with those for known amounts of radioactive barium and antimony and the ratio permits a mathematical calculation of the quantity of the respective element, expressed in micrograms, present in the test sample. These results are then compared with results of similar testing of material taken from the hands of persons known not to have recently fired a gun and from persons known to have fired guns.

In his direct testimony, Doctor Eichor, after explaining the analysis process, stated, with respect to the detection kit which he received from Officer Brocksmith, containing the swabs used by Officer Roither on appellant's hands: " * * * [T]hese were sent to us or actually delivered to me by Don Brocksmith, and I, after receiving them, then went through the procedure of analyzing each of the individual cotton swabs for the materials barium and antimony that we have just talked about."

Thereafter, when the witness was asked the quantities he had found, counsel for the defense interposed the following objection:

"At this point I object on the grounds of insufficient foundation laid to show exactly how these readings were obtained, whether they were obtained under conditions of validity or accuracy and no foundation laid to qualify him as an expert in analyzing this data or presenting it."

No ruling was made on the objection when the prosecutor volunteered to interrogate the witness further. Further questioning followed regarding the witness's qualifications and experience. He also went over again the procedures for the analysis. At the conclusion of such testimony, Doctor Eichor was again asked the values in micrograms of barium and antimony in each of the swabs. Defense counsel stated: "I would renew my previous objection as there is not evidence in the case that all these steps were personally done by the witness or they were actually in his personal knowledge." The prosecutor responded that evidence of the steps taken was before the jury without objection and the trial court overruled the defendant's objection.

Doctor Eichor then testified to a finding of the following values:

| Left hand back | — | Barium | — | .464 micrograms |
| | | Antimony | — | .025 " |
| Left hand palm | — | Barium | — | .432 " |
| | | Antimony | — | .025 " |
| Right hand back | — | Barium | — | .369 " |
| | | Antimony | — | .010 " |
| Right hand palm | — | Barium | — | .544 " |
| | | Antimony | — | .036 " |
| Blank swab | — | Barium | — | .0037 " |
| | | Antimony | — | .0007 " |

Doctor Eichor testified that such values "were much higher than the normal values received for hand blank (persons who had not fired a gun) data." He also stated: "These values are in the very upper level of what we observed from firing data."

At the time of defendant's objection, the only evidence before the jury as to the conduct of the analysis was that above quoted in which the witness stated that he had gone through the steps of the analysis which he had described.

On cross-examination, it was brought out that Doctor Eichor himself had not performed every step of the analysis. He stated that he did not recall whether he put the standards into the reactor. He also stated that he did not remember whether he checked the "flux" during the time that the standard and the swabs were in the reactor. (Flux is the intensity of neutron bombardment of the particles placed in the reactor.) Doctor Eichor stated that a constant flux is necessary and is more important than knowing what the flux was, and that if the flux was not constant, all of his conclusions would be invalid. He stated that the flux was probably checked by someone who had control over the monitoring devices. The witness stated: "I never observe the flux and I can check to see if I did or did not on the standard, because in this particular type of experiment we have many swabs of which I put some in, other people put some in. I count, make some of the radioactive measurements and the technician working for me does, so we do what has to be done." He also acknowledged that he did not put the swabs into the reactor. He also stated that the mathematical calculation of the values of the elements here found was done by his technician and checked by him. When the calculation was placed in evidence, defense counsel stated that he had no objection. In further cross-examination, the witness stated: " * * * I always check, for example, a very important thing such as—well, most everything, I check. I visually compare them and routinely go through, repeat entire calculations as a check."

On this record, it cannot be said that the trial court, on the grounds now urged, erred in admitting Doctor Eichor's testimony. At the time of defendant's objection, the only evidence before the court was the witness's statement that he had performed the analysis. When the cross-examination revealed that the witness meant by that statement that he and someone working with him performed the analysis, defendant took no action to expunge the testimony previously admitted on the basis of the witness's prior statement. In fact when the calculations of

the ultimate results were subsequently offered in evidence, defense counsel stated he had no objection.

The trial court did sustain objection to a question by the state to Doctor Eichor, intended to obtain his opinion as to whether or not the findings placed in evidence afforded a basis for a conclusion as to whether or not the person from whose hands the test material had been taken had recently fired or handled a firearm. To present such opinion testimony, the state called Doctor James Vogt, the manager of the nuclear science research group at the University reactor. Defense counsel admitted Doctor Vogt's qualifications as an expert witness. He testified to the compilation of test data by neutron activation analysis at the University facility for gunshot materials residue from the hands of persons known to have recently fired a weapon and from persons known not to have done so. Comparing the results of the analysis of the material from appellant's hands with the test results, Doctor Vogt concluded that "the results of the tests from the hands of Robert Toney were indicative that this individual had recently handled and discharged a firearm." This testimony was received over the objection of defense counsel, stated as follows:

" * * * [T]here has been no foundation laid to establish the accuracy of these specific readings. Specifically, it was admitted by the last witness that there were steps in the process he did not do, he didn't remember who did them. He didn't remember who kept the count of whether the flux was constant or not and therefore this goes beyond the matters of personal knowledge of this witness and there hasn't been a foundation laid to show they're in the personal knowledge of any witness that has yet testified."

■ The overruling of this objection was not error. Doctor Eichor's testimony was in the case. The documentary evidence of the result of the tests which was presented to Doctor Vogt as a basis for his testimony was in the case without objection. The question objected to which produced Doctor

Vogt's opinion was based upon an assumption of facts for which there was evidence of probative value.

■ Appellant has briefed numerous other attacks upon the neutron activation analysis evidence. However, the transcript fails to show that such other attacks were presented at the trial and they, therefore, have not been preserved for appellate review.

### Photographic Evidence

Appellant contends that the trial court erred in admitting into evidence a photograph of the bedroom of the Banneker house and a photograph of the interior of the top drawer of the dresser which showed its contents. Their admission is claimed to have been erroneous because the photographs indicated to the jury that appellant and his companions were black militants.

When these exhibits were identified and offered in evidence at the trial, defense counsel objected to the bedroom photograph on the grounds that it showed two posters, "one of which is quite clearly a militant poster, * * * ." The court suggested that the offending portion of the poster be covered with an evidence identification sticker. When defense counsel objected to "editing" of the picture, the court admitted the photograph "as is."

When the photograph of the contents of the dresser was offered, defense counsel objected that the picture would prove nothing. At the suggestion of the prosecutor the word "Guerilla" was obliterated from the book or pamphlet in the drawer, entitled "Manual for Guerillas."

■ The trial court is accorded considerable discretion in the admission of photographic evidence. If the photographs have a potential value in assisting the jury to understand the verbal testimony or in corroborating such testimony, an appellate court will not ordinarily disturb the court's ruling admitting them. *State v. Jackson,* 499 S.W.2d 467, 472[5–8] (Mo.1973); *State v. Vineyard,* 497 S.W.2d 821, 829[19–21] (Mo.App.1973). The photographs are not

inadmissible because they depict what a witness has described orally. *State v. Jackson, State v. Vineyard,* supra. These photographs did show what Officer Boulch observed upon entering the bedroom. They thus met the test of relevancy and their admission is not to be faulted on that score.

■ Insofar as the inflammatory content of the exhibits is concerned, the obliteration of the word "Guerilla" obviated that objection with respect to the contents of the drawer. Any speculation that the jurors would have inferred what had been obliterated is purely such, and does not call for the conclusion that the admission of the altered photograph was error. *State v. Crossman,* 464 S.W.2d 36, 41[3] (Mo.1971).

■ As for the portion on the wall, shown in the bedroom photograph, it was not a significant part of the photograph as indicated by the court's offer to expunge it by use of an evidence sticker and its presence was not referred to in any manner. The trial court correctly concluded that its content was not such as to render the photograph inadmissible.

### Other Demonstrative Evidence

■ Appellant contends that the trial court erred in admitting into evidence a bandolier, a "bullet belt" and a photograph showing numerous miscellaneous items, including shotgun shells, gun cleaning rods and a hacksaw, none of which was shown to have been related to the robbery and shooting.

Appellant's brief makes no reference to the identification of the photograph covered by this point. His motion for new trial referred to it as Exhibit No. 59, but, according to the transcript, Exhibit No. 59 was a handgun, not a photograph. Inasmuch as the items referred to in the objection were found in the bottom drawer of the dresser, it would seem clear that the photograph would have been of that object and its contents. Such a photograph, marked as State's Exhibit No. 57, was produced but the trial court sustained defense counsel's objection to the introduction into evidence

of that exhibit. Therefore, insofar as the record shows, the only matters for consideration in connection with this point are the bandolier and bullet belt.

Sergeant Boulch testified that in the top drawer of the dresser in the bedroom, where he saw a pistol, there was a bandolier of .38 shells. He identified State's Exhibit No. 63 as that item. He also testified that he saw a bandolier of shotgun shells in the bottom drawer of the dresser, introduced in evidence as State's Exhibit No. 64.

The state does not contest appellant's assertion that no one at Cousin Hugo's testified that the robbers were wearing bandoliers containing shotgun shells or bullets. The state conceded as much when it offered the items in evidence and appellant's counsel objected on the grounds of lack of connection with the offense.

These bandoliers contained ammunition similar to that found to have been used in the weapons fired at Cousin Hugo's. In order to render the objects admissible, it was not obligatory that the state show that they were worn during the crime. See *State v. Alred,* 524 S.W.2d 895 (Mo.App. 1975). They did have probative value as showing planning and preparation for such criminal activity as occurred at Cousin Hugo's. *State v. Evans,* 237 S.W.2d 149, 151[1, 2] (Mo.1951). Counsel for defendant acknowledged that they had probative value.

The probative value of these items distinguishes this case from the numerous cases cited and relied upon by appellant, most of which involved the introduction into evidence of weapons not shown to have been connected with the offense for which the defendant was tried. Thus in *State v. Holbert,* 416 S.W.2d 129 (Mo.1967), where a defendant was charged with carrying a concealed weapon, the introduction into evidence of an unconcealed weapon found on his person and, particularly, another weapon found in his car, was held error as the items had "no legitimate probative value" (416 S.W.2d 133) in proof of the crime charged. In *State v. Smith,* 357 Mo. 467, 209 S.W.2d 138 (1948), the admission into

evidence, on defendant's trial for burglary, of two pistols found in the defendant's wife's purse at the time of defendant's arrest in an auto in which he and his wife were riding, was held error. The lack of probative connection and the prejudicial effect of producing weapons to support a burglary charge were obvious in that case. In *State v. Merritt*, 460 S.W.2d 591 (Mo. 1970), defendant was charged with assault with a gun. The shooting had occurred in a tavern in the presence of a number of persons, none of whom testified that he saw defendant with a gun. The following day, a gun was found outside the tavern. At the trial there was no evidence to connect the gun with the defendant or with the offense, except for the circumstances of its being found. Its introduction in evidence was held reversible error because of the failure to connect defendant with the gun and the gun with the shooting. Here, the bandoliers were connected with defendant by being found in his residence and were connected with the crime by the contents of ammunition similar to that found at the scene of the crime. In *State v. Wynne*, 353 Mo. 276, 182 S.W.2d 294 (1944), the court discussed at length the problem of producing in evidence weapons not related to the offense charged but the basic vice of the evidence there involved was the lack of showing that the demonstration which involved a weapon was in fact similar to the situation described by the defendant in her testimony and which the demonstrative evidence was intended to rebut.

Other authorities cited by appellant (*State v. Bray*, 278 S.W.2d 49 (Mo.App. 1955); *State v. Himmelmann*, 399 S.W.2d 58 (Mo.1966); *State v. Richards*, 334 Mo. 485, 67 S.W.2d 58 (1933)) are also distinguishable and not here controlling on appellant's claim of error.

In this case, no error can be predicated on the trial court's overruling objections to the introduction of these items into evidence.

### Closing Argument

The defense had as a witness Lyle Benton, the laundry superintendent at the St. Louis County Hospital. He testified that appellant worked at the laundry from September 27, 1971 until March 17, 1972. His regular hours were 7:00 A.M. to 3:00 P.M. He earned $355 per month, doing "medium hard work." He had worked regularly until he failed to appear for work on March 18, 1972. Benton had no knowledge of financial problems on appellant's part during the period of employment.

In closing argument, defense counsel stated that the evidence of appellant's employment had bearing on intent and motive:

"* * * If he's the kind of vicious bum that they're going to go around shooting people's heads off, do you think he would be working in a laundry every day wasting his time for $355 a month? Do you think that I would be here as a Public Defender because he doesn't have enough money to hire a lawyer if he was any kind of big-time robber or anything like that? It just doesn't add us (sic).

"If someone is going to—what Mr. Merz calls a carefully planned robbery—a robbery where they are hoping to get lots of money, are they going to work at a two-bit job every day? Are they going to go to work that day?

"Of course they aren't. His boss also told you he knew that he had no financial trouble, never asked for an advance in his salary. There's no motive.

"You know, we didn't hear what the occupations of the other persons are or if they had any or not, but we know this: The one case, Robert Lucious Toney did not have the motive to be the kind of person to participate in this. And take that into consideration when you go back into your jury room, take into consideration the fact that not only did he work every day but he even worked some holidays. That does not sound like the kind of guy who's going around and taking other people's money.

"I submit it doesn't.

"Another thing that's very important is the fact that he worked for St. Louis County at the hospital. That has to tell you a little bit about his background. You know,

they are not going around—they aren't necessarily in the laundry going to hire people who are the paragon of society but you know there are a certain type of people they are not going to be hiring. But you know something about his background if he works for St. Louis County like he did for six months up until the very day this happened."

In his final summation the prosecutor stated:

"Mr. Anzalone comes in here and he tells you, 'Would a boy who works in a laundry do this?' Why not? He's not a boy, he's a man; and what has his working in a laundry got to do with anything?

"He tells you this proves he has a good background. It proves no such thing. Mr. Anzalone did not put the character of the defendant in issue, he comes in here and brings one witness to say he works in a laundry. He brings in one man who doesn't really even know Robert Toney except he sees him during the day. He has to bring his records along to see how many days he missed.

"That man no more knows anything about Robert Toney than you do about his background. You know something that the man doesn't know because you have heard all the evidence here. You know what Robert Toney really is.

"He's not just a boy who works in the laundry. He is a man who was willing to go into Cousin Hugo's and slaughter two people, try to slaughter two more and probably would have slaughtered the whole tavern full of people had the police not come.

"MR. ANZALONE: Again, I ask my objection go to all inflammatory comments of this type.

"THE COURT: Objection will be overruled.

"MR. ANZALONE: Will it go to all comments of this type, Your Honor?

"MR. MERZ: Mr. Anzalone has argued to you that the defendant's character must be good. Mr. Anzalone has the opportunity to bring it before you, character witnesses if he chooses to do so, he can bring in as many people as he wants to to testify to the good character of the defendant.

"What did you see? None. Nobody testified to his good character. The man who sat up here did not testify to any such thing. Why are there no people here to testify to his good character if it's so good? In the whole of St. Louis County he cannot find one person to testify to the good character of Robert Toney.

"There's no evidence of his bad character other than the evidence of this crime; but what more do you need? Believe me, there's no evidence been presented here that his character is anything other than exactly what the evidence of this crime shows you."

Acknowledging that no objection was made at the trial to the prosecutor's statements regarding appellant's character, appellant now contends that the remarks of the prosecutor amounted to a comment on the failure of appellant to present character evidence, and that in permitting such remarks, the trial court admitted plain error, because the remarks of the prosecutor destroyed appellant's presumption of good character and implied that his reputation was bad.

■ Appellant invokes the well-established rule that it is improper for the prosecutor in his argument to comment upon the failure of the defendant to adduce evidence of his good character. The basis of the rule is the legal presumption that every person's character is good. When the defendant does not place his character in evidence, the state cannot attack it. To permit argument based upon failure to produce evidence of good character would allow the prosecutor to destroy the presumption of good character, without evidentiary basis. *State v. Shipley*, 174 Mo. 512, 74 S.W. 612 (1903); *State v. Pinkston*, 336 Mo. 614, 79 S.W.2d 1046, 1047–1048[1, 2] (1935); *State v. Corbin*, 186 S.W.2d 469, 471–472[1, 2] (Mo. 1945); *State v. Sexton*, 262 S.W. 63, 64–65[5] (Mo.App.1924).

■ Appellant is not entitled to the benefit of that rule in this case for two reasons.

In the first place, the argument of the prosecutor was in reply to "the remarks and suggestions made by appellant's counsel in addressing the jury." *State v. Pinkston,* supra, 79 S.W.2d 1048[3]. Appellant's counsel did not refer specifically to his client's "character" in arguing the effect of his former supervisor's testimony. However, it is patent that such was the intended impact of the argument. *State v. Pinkston,* supra; *State v. Reagan,* 108 S.W.2d 391, 397[17–20] (Mo.1937).

Furthermore, the prosecutor went as far as he did and his remarks were permitted to stand unchallenged because no objection to the argument on the grounds now urged was interposed. That is the second reason for concluding that no reversible error is to be predicated on such argument. Appellant seeks relief under the plain error rule (Rule 27.20(c)). " * * * [A]lleged errors on closing argument of counsel * * * do not justify relief as plain error unless they are determined to have had a decisive effect on the jury or to have resulted in a manifest injustice or miscarriage of justice. *State v. Shepherd,* 494 S.W.2d 53 (Mo. 1973)[1]; *State v. Elmore,* 467 S.W.2d 915 (Mo.1971)[3]." *State v. Collins,* 520 S.W.2d 155, 157[4, 5] (Mo.App.1975). Here the remarks now objected to were responsive to argument of appellant's counsel, the matter was not dwelt on at length or urged repetitively. Viewing this relatively minor incident in the light of the entire trial proceedings and the evidence presented, this court concludes that the plain error rule is not available as a vehicle for relief.

Appellant argues that *State v. Shipley,* supra, required the trial court to stop the prosecutor's argument, even though no objection was made. There is some language to that effect in *Shipley.* 74 S.W. at 613. However, in making such observation, the court noted that the prosecutor's remarks were not "a mere reply by argument to defendant's counsel * * *." Defense counsel did object in *Shipley* and the trial court compounded the error by giving the jury what the court found to have been an oral instruction on the law. *State v. Ship-*

*ley* did not require the court in this case, sua sponte, to stop the prosecutor's argument.

Finding no errors in the matters complained of, the judgment will be affirmed.

Judgment affirmed.

All concur.