STATE of Missouri, Respondent,

v.

Christopher L. DAVIS, Appellant.

No. 35594.

Missouri Court of Appeals,
St. Louis District,
Division Four.

June 29, 1976.

Motion for Rehearing or Transfer
Denied Aug. 18, 1976.

Robert E. Heisler, Hayes & Heisler, Clayton, for appellant.

John C. Danforth, Atty. Gen., W. Mitchell Elliott, Asst. Atty. Gen., Jefferson City, for respondent.

ALDEN A. STOCKARD, Special Judge.

Appellant, Christopher L. Davis, was convicted by a jury of two counts of first degree murder, one count of assault with intent to kill with malice, and two counts of first degree robbery by means of a dangerous and deadly weapon. He was sentenced to two life terms, one term of two years, and two terms of twenty-five years each, all to be served consecutively.

Appellant does not attack the sufficiency of the evidence. We shall summarize the facts, but shall set them forth sufficiently to permit a discussion of the issues.

A little after 1:00 o'clock in the morning of March 18, 1972, several young black persons, including appellant, armed with various weapons entered a tavern named Cousin Hugo's in Maplewood, Missouri, and robbed the patrons. During the course of the robbery a patron was shot, a barmaid was stabbed, and two other patrons were killed, one by a stab wound and the other, an off-duty police officer, by a shotgun wound of the head.

Appellant first contends that the trial court erred in overruling his motion to suppress certain evidence which was seized by the police at the home of Beverly Telfair and Lucius Toney located at 1338 Banneker Street. By stipulation of counsel, appellant's motion to suppress evidence was submitted to the court upon the testimony adduced at a hearing on a similar motion in the case of *State v. Johnson,* 539 S.W.2d 493 (Mo.App.1976). The evidence sought to be suppressed in each case was identical. We shall relate briefly the circumstances under which the evidence was seized by the police.

The police were informed that four or five young black males had committed the crimes at Cousin Hugo's, and that four black males, one of whom was Lucius Toney, had been seen in the neighborhood of Cousin Hugo's prior to the commission of the crimes. Sergeant Boulch, and two other officers, went to 8109 Dumas Street. Toney's mother was there, and when asked where her son was she became extremely agitated. She hurried down the street to a house around the corner on Banneker Street and shouted "Lucius, Lucius, the police." Toney, who fitted the description of the perpetrators of the crimes at Cousin Hugo's, came onto the porch, and the officers asked for and were granted permission by him to enter and look around the house. After the officers entered, Toney ran past them into the bedroom, and at the same time another person was seen running into the bathroom. Sergeant Boulch followed Toney and observed two more black males in the bedroom, and he also saw what appeared to him to be a shotgun lying on the floor. The officer checked the immediate area for weapons, and in doing so saw a pistol in a partially opened dresser drawer. He also noticed a holster strapped to the belt of one of the persons (appellant) which he removed. (This holster and a pistol found in a dresser drawer were subsequently identified as belonging to the off-duty policeman who was killed by a shotgun blast during the robbery.) Sergeant Boulch placed the four individuals under arrest. After they were handcuffed a quick search of the bedroom and bathroom was made to determine if there was anyone else in the house. During this search the officers found a pistol in the bedroom partially covered by a black beret. (This pistol was subsequently identified as the weapon from which the bullet was fired which wounded the patron.) In the bathroom there was a pile of dirty clothes, which was large enough to conceal a person, on which there was a large plastic bag. When the officer attempted to move the clothes to determine if anyone was concealed under them, the contents of the bag were revealed. It contained ladies' purses, billfolds, credit cards and driver licenses. (These items were subsequently identified as property of the robbery victims, and appellant's fingerprints were found on two of the items.)

About this time a large, unruly crowd gathered outside the house and created what gave indications of being a potential riot situation. The police officers were ordered by higher police authorities to leave the house and they did so, but in order to preserve and protect the evidence previous-

ly discovered they took with them the plastic bag containing the purses, billfolds and cards, a knife, the holster, the guns, and other items. On the following day two police officers returned to the house on Banneker Street to search for a suspect by the name of Hill. Beverly Telfair, the co-lessee of the house, told the officers that no one was in the house except her two children, and she consented in writing for the officers to search the house. During this search, the officers found three shotguns concealed in the bathroom.

Based on the above testimony, taken at the hearing on the motion to suppress evidence in *State v. Johnson,* supra, and made a part of the record in this case by stipulation, the trial court overruled appellant's motion to suppress.

Appellant first asserts that the trial court erred in overruling his motion to suppress evidence because (a) the search was made without "voluntary consent;" (b) the search and seizure was not incident to a lawful arrest; (c) the subsequent search made after the arrests "was not confined to the suspects' immediate area of control;" (d) the St. Louis County Identification Bureau "*acted totally without the scope of authority;*" and (e) the alleged consent to search given by Beverly Telfair, which led to the seizure of the three shotguns, "was not freely and voluntarily given."

■ The State argues that appellant has no standing to challenge the validity of the search of the house at 1338 Banneker Street. "Standing to object to a search and seizure and use of the fruits in evidence is predicated upon a possessory interest in the items seized; a possessory interest in, or legitimate presence on, the premises searched; or is 'automatic' where the same possession needed to establish standing is an essential element of the crime charged." *State v. Ross,* 507 S.W.2d 348, 353 (Mo. 1974). See also *In re J. R. M.,* 487 S.W.2d 502 (Mo. banc 1972). In this case appellant asserts no propriety interest in any of the items or property seized by the police. He even disclaims any interest in or knowledge of the holster which the police officer said

he took from appellant's belt. Also, he had no possessory interest in the premises. As he asserts in his brief, he "did not ever reside at Banneker." However, he was present when the first search was conducted, and he was in the house when he was arrested. There is nothing in the testimony at the hearing to suppress to indicate why he was there. In *Jones v. United States,* 362 U.S. 257, 267, 80 S.Ct. 725, 734, 4 L.Ed.2d 697 (1960), it was held that "No just interest of the Government in the effective and rigorous enforcement of the criminal law will be hampered by recognizing that anyone legitimately on premises where a search occurs may challenge its legality by way of a motion to suppress, when its fruits are proposed to be used against him." While we do not necessarily agree that legitimate presence alone should establish legal standing to challenge a search, we are bound by the interpretation by the United States Supreme Court of the Fourth Amendment. There is nothing to show that appellant was or was not legitimately on the premises but one of those there arrested was Lucius Toney, the co-lessee of the house, and if any inference is permissible it would be that he was present with Toney's consent.

■ Appellant's challenge to the search and seizure which we have labeled as (a), (b), and (c) were specifically ruled in the opinion in the case of *State v. Johnson,* supra, handed down by this Court on May 4, 1976. As previously noted, appellant's motion to suppress in this case was submitted to the trial court on the evidence that was received in the Johnson case in support of a motion in that case to suppress the identical evidence. This Court ruled in the Johnson case that the search of the house on Banneker Street was made pursuant to the voluntarily given consent on the part of Lucius Toney, a co-tenant; that the arrests there made, which included the arrest of appellant, were made with probable cause; and that the search made subsequent to the arrests was not overbroad in its scope but was authorized under the circumstances. We also note that the precise issues pertain-

ing to the same search and seizure were ruled adversely to appellant's contentions in *State v. Toney*, 537 S.W.2d 586 (Mo.App. 1976), by the Missouri Court of Appeals, Kansas City District. We approve of those rulings, and we see no occasion to burden this opinion with additional recitation of the basis for them. Instead, reference is made to Part XII of the opinion in the Johnson case and to the opinion in the Toney case.

■ Appellant also asserts, item (d), that the motion to suppress should have been sustained because the St. Louis County Identification Bureau acted "totally without the scope of authority." The argument portion of appellant's brief adds little to the barren assertion in the point. The substance of the contention appears to be that the "processing" done by the members of the Identification Bureau was "not incidental to a lawful arrest; there was no emergency situation requiring immediate action to keep evidence from being destroyed; [and] no consent was given." We find no merit to this contention. Appellant does not direct our attention to any particular item of evidence which he claims was improperly "processed," or that was not obtained by the consent to search granted by Lucius Toney, or which was not discovered while in plain sight or while the officers were attempting to determine if other persons were present in the house. Also, we disagree completely with appellant's assertion that "No emergency situation" existed. As previously noted, a large unruly group of black people had gathered around the house and had begun to pound on the walls. One police officer observed assaults by the crowd being made on other police officers. A potential riot situation clearly existed and in the opinion of one of those present "the entire scene would have been destroyed" in a very short time. As stated in Part XII of the opinion in *State v. Johnson*, supra, "the case falls within an exception recognized in *State v. Wiley*, 522 S.W.2d 281, 290 [16, 17] (Mo. banc 1975). Exigent circumstances as noted herein indicated to the officers that removal or destruction of the evidence was imminent or threatened. The validity of the search and seizure in the instant case may be sustained on the limited ground that an emergency situation developed which threatened the removal or destruction of evidence that officers had cause to believe was present and relevant to the crime being investigated." We agree with this conclusion.

■ The remaining assertion of appellant, item (e) of Point I, is that "the alleged 'consent' to search given by Beverly Telfair, which led to the seizure of three shotguns, was not freely and voluntarily given." This contention is without merit.

On March 19, 1972, two police officers went to the Banneker house looking for a fifth person suspected of participating in the crimes at Cousin Hugo's. Because of the nature of the crimes and the other circumstances they had a substantial number of officers in the neighborhood. Upon the arrival of the two officers at the house, Beverly Telfair, who was a co-lessee of the house, first gave them her oral consent and then her written consent to search the house. No search was made prior to the consent, and no objection was later made to the search.

As a co-lessee she had equal authority over the premises and could authorize the search. *State v. Stuart*, 415 S.W.2d 766 (Mo.1967); *United States v. Martinez*, 450 F.2d 864 (8th Cir. 1971). Appellant argues that under the attending circumstances she would not have voluntarily consented to the search. That is pure speculation. The fact is that she did give her consent, not only orally but also in writing. The trial court found, after a review of all the attending circumstances, that the consent was voluntarily given, and based on our review of the evidence we are in complete agreement.

■ In addition to the above, it is immaterial that a motion to suppress evidence may have been improperly overruled if the evidence which is the subject of the motion is not subsequently received in evidence, or if received it is not objected to, or if received and objected to it is not challenged on appeal on the ground that it was improperly admitted in evidence. The three shot-

guns were received in evidence over appellant's objection, but appellant does not assert on this appeal that the court erred in admitting them. Only Point II in appellant's brief pertains to the admission of evidence. It is general and asserts error in the admission of "certain state exhibits." In the argument under this point it is asserted that "Specifically, appellant objected to the introduction" of seven exhibits, identified by number, none of which were any of the sawed-off shotguns found in the bathroom of the Banneker Street house. It is clear that appellant has not preserved for appellate review the issue of whether the three shotguns were improperly admitted into evidence. For that reason, it is now immaterial whether the trial court should have sustained the motion to suppress as to them, although for the reasons previously set forth we are of the firm opinion that they were not obtained as the result of an unauthorized search and seizure.

We now consider Point II, and as noted because of its generality it does not comply with Rule 84.04(d). However, by referring to the argument portion of the brief, a procedure not within the contemplation of the procedural rules, we can determine the substance of appellant's contentions.

The exhibits itemized in the argument are Exhibit 52 (a photograph of miscellaneous items from dresser drawers, including boxes of shotgun shells, loose shells, pistol ammunition, gun cleaning equipment, berets, etc.); Exhibit 57 (knife sheath); Exhibits 66 and 67 (gun stocks); Exhibit 73 (hacksaw); Exhibit 81 (a "belt" of bullets); and Exhibit 82 (a bandolier containing shotgun ammunition). Appellant contends that this evidence was "totally irrelevant, of no probative value on the issue of guilt," and that the "only effect was to inflame and prejudice the jury."

In Part X of the opinion in *State v. Johnson,* supra, and Part III of the opinion in *State v. Hill,* 539 S.W.2d 521 (Mo. App.1976), both companion cases to this one, the precise contentions here presented were ruled adversely to appellant's contentions concerning the identical evidence. No fac-

tual distinction exists in this case which would compel or justify a contrary result. As stated in *State v. Hill,* supra, "The circumstances of [the] finding [of the items of evidence] justify an inference of the likelihood or possibility of many of these items having been used in the preparation or commission of the crime. They are therefore admissible ' "for the purpose of showing availability to accused of the means of committing the crime in the manner in which it is shown to have occurred." ' *State v. Cuckovich* [485 S.W.2d 16, 23, (Mo. banc 1972)]. This is especially true of the hacksaw, the gun barrels and the shotgun stocks not objected to in the *Johnson* case. Numerous persons testified that the robbers were armed with sawed-off shotguns. [This was true in this case.] It is well-settled that '[a]rticles showing motive, or malice, or intent, or knowledge or preparation, may be received in evidence if shown to be connected with the crime or with the accused.' *State v. Evans,* 237 S.W.2d 149, 151 [1, 2], (Mo.1951). Items found soon after the crime in the possession of a defendant's criminal associates are sufficiently connected to the defendant to be admissible in evidence against him. A hacksaw, gun barrels and gun stocks clearly indicate the availability of items used in the preparation of sawed-off shotguns and the items were therefore properly admitted." We adopt by reference the rulings in the two cited companion cases.

In Point III, appellant asserts the trial court erred in ordering or allowing "excessive and obviously visible security measures."

In support of appellant's motion for a mistrial, based on "excessive" security arrangements, the public defender testified that when the jury was boarding a bus in the parking lot he observed "approximately one dozen uniformed officers from Clayton and St. Louis County on the lot," and four marked police vehicles. He also testified that there were uniformed police officers stationed "behind the courtroom at either end of the corridor which [were] visible to the jurors at all times when they're going

to and from their jury rooms, [and that] there [were] metal detectors outside the courtroom where anybody entering the courtroom [was] searched." Another person from the public defender's office testified that she observed police officers take two young black persons into custody at a time when the jury could see the occurrence. We note, however, that there was nothing to indicate that this action of the officers was not appropriate under the circumstances. During a discussion the trial judge commented that he was on the parking lot at the time the two persons were taken into custody, and that he recently had chastised the security office for laxity in protecting the parking lot. The trial judge also stated that he had heard of threats against appellant's life and of threats to free him. After commenting that under the circumstances the court saw nothing unusual about the security arrangements the motion for a mistrial was overruled.

Appellant was not shackled during the trial or wearing prison garb. Therefore, *United States v. Samuel,* 431 F.2d 610 (4th Cir. 1970) and *Dennis v. Dees,* 278 F.Supp. 354 (E.D.La.1968), cited by appellant are not in point.

■■■■■ A trial court has the duty to make such orders as may be necessary to secure a quiet and safe trial. *State v. Hill,* supra. In taking security precautions care should be exercised to not create an atmosphere prejudicial to the accused, but it is a balancing of the circumstances, and though unnecessary measures should be avoided, such measures should be taken as appear to be reasonably necessary for the maintenance of order during the trial and the retention of the custody of the accused. *Bibbs v. State,* 504 S.W.2d 319 (Mo.App. 1973). What could constitute excessive security measures in one situation could be reasonable in another.

■■■ Appellant was charged with four offenses that were committed in a most ruthless and brutal fashion. As appellant admits in his brief, "During the course of [the] robbery, two people were apparently senselessly murdered; a few others were seriously injured." Appellant's trial was widely publicized, and the trial court had reports of threats against appellant and that an attempt might be made to free him. The court was aware that appellant was reported to be a member of a black militant organization. This case was tried subsequent to *State v. Johnson,* supra, and we can assume that the trial court knew, as stated in the opinion in that case, that "At the time of the verdict a highly explosive situation developed inside and outside the courtroom which * * * could easily have developed into a riot but for the actions of persons on security duty." When faced with a situation as presented by the circumstances of this case, a court is not required to close its eyes to realities and wait until something happens before taking appropriate security precautions. Neither are the security measures taken to be judged by the benefit of hindsight. Under the circumstances it cannot be said that the security measures were unreasonable; in fact, the circumstances clearly indicate that any less stringent precautions would have been unreasonable.

Appellant's fourth and final point is that the trial court erred in overruling his motion to suppress "testimony concerning eyewitness confrontations and in-court identification" in that "said confrontations were 'inherently suggestive,' and fatally tainted by local media accounts of the crimes committed." Only by referring to the argument portion of the brief are we able to determine the basis for these contentions.

There were three lineups but appellant was in only two of them. The first, containing eight persons, was held at the Maplewood Police Station a few hours after appellant was arrested. Appellant makes two challenges to this lineup; both being based on testimony of William Hagerty given at the trial, not at the hearing on the motion to suppress, and both of which are totally without merit.

■■■ Appellant asserts in his brief that Mr. Hagerty testified that "appellant was the only individual in the Maplewood lineup

that had facial hair." Assuming, but certainly not implying or holding, that if at trial some new evidence is introduced which might be construed to imply a "suggestive" lineup there is a duty on the court to take some action *sua sponte* (appellant asked for or suggested none), appellant's contention is without factual support. Mr. Hagerty testified that he saw appellant at Cousin Hugo's during the robbery and that he was carrying a pistol. He later testified on cross-examination that appellant "needed a shave" but did not have a beard, and that he had a "very light moustache." He was then shown a photograph of the lineup and was asked if "anybody on this Maplewood lineup look like they need a shave?" He pointed to the picture of appellant and said, "This man does." He was then asked if "anybody else" needed a shave and he pointed to the pictures of two other persons. Appellant apparently relies on the following question and answer which concluded that part of the cross-examination.

"Q. OK. Now the man that fit the description of the man you saw in Hugo's as far as height approximately, that man was the only other man in that lineup that looked like he needed a shave to you, wasn't he, or had hair on his face?

A. I would say yes, sir."

We do not consider this isolated and somewhat inconsistent answer, made to a confusing and leading question, affords any basis for a determination that the lineup was "suggestive," even if appellant had called the matter to the attention of the court. But, more important, the trial court had before it, and we have before us as an exhibit, an enlargement of a photograph of the Maplewood lineup. It clearly shows that at least four of the eight persons "needed a shave" or had "facial hair," and that three had distinct moustaches and two had a "light moustache." Appellant's contention that he was the only one in the lineup that had "facial hair" is factually incorrect.

Appellant's other challenge to the Maplewood lineup is also based on testimony of

Mr. Hagerty given at the trial. He asserts that Mr. Hagerty stated that none of the others in the lineup "was of the same approximate height." The witness did not so testify. He stated that one of the persons in the lineup was "taller" than appellant and was "approximately five ten" in height, and that another person was "probably five eight, thereabout." Appellant was, in fact, 5 feet 8½ inches in height. Two others in the lineup were 5 feet 9 inches in height, and a third appears to be almost the exact height of appellant.

■ Of course, there were some differences in the appearances of the eight persons in the lineup, but there were no pronounced differences and there was nothing to single out appellant or to suggest him as one of the persons who committed the crimes at Cousin Hugo's. The purpose of a lineup is to determine whether a person who was a witness to the crime can, without improper suggestive procedures, identify the perpetrator of the crime. It is not, as seems to be appellant's contention, to so conceal the perpetrator and so confuse the viewer that no identification of the actual perpetrator is possible.

■ Our examination of the photograph of the lineup and of the testimony concerning the conduct of the lineup discloses that it was fair, not suggestive in anyway, and that it meets the most stringent requirements that have been pronounced by any court.

■ We find no challenge whatever in appellant's brief to the conduct of the lineup held in St. Louis County three days after the Maplewood lineup. It contained ten persons, all dressed the same, and who were reasonably uniform in height and in coloring. We note here that in *State v. Hill*, supra, this Court reviewed the procedures under which the lineups were held and ruled as follows: "The record reveals no constitutional infirmity in the conduct of the lineups." We find absolutely no merit in the challenge to the manner in which the lineups were conducted.

Appellant also contends that the four witnesses who made in-court identification did not have an adequate source of identification independent of what he unjustifiably asserts were improper lineups.

The issue of whether there existed an independent basis for the in-court identifications usually is presented when there is a defect in the pretrial lineup procedures, and then, as stated in *United States v. Wade,* 388 U.S. 218, 240, 87 S.Ct. 1926, 1939, 18 L.Ed.2d 1149 (1967), the prosecution should have an "opportunity to establish by clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the lineup identification." In this case there was no defect in the pretrial lineup procedures. However, one of the identifying witnesses, Thomas Canfield, had observed television news reports and newspaper pictures before he identified appellant at the St. Louis County lineup, and another witness, Gloria Tayloe, observed newspaper photographs after she attended the Maplewood lineup at which she identified appellant but did not report to the police until later that she had recognized him. We shall, therefore, examine the independent source of identification of these two witnesses, and comment generally on the issue as to the other two witnesses.

Thomas Canfield observed appellant from two to four minutes while he was in the back room of Cousin Hugo's during the robbery. He saw appellant, armed with a pistol, and another person, armed with a sawed-off shotgun, enter the room. Canfield and the persons in his party were directed to stand in front of the juke box where Canfield had "a fairly good view" of appellant. At one time appellant was approximately three feet from him while appellant was picking up billfolds and purses from the floor. For a "minute or two minutes" while appellant was directly in front of him, Canfield "did not take [his] eyes off of him."

Gloria Tayloe was in the back room with her husband when the robbers entered. One had a shotgun and the other, whom she positively identified in the courtroom as appellant, had a pistol. She was within three feet of the person who had the shotgun, and she "walked right past" appellant and "practically had to move aside to miss the gun" he was holding. She described in detail what the two men did and stated that the robber with the shotgun was about 5 feet 2½ inches in height (he was actually 5 feet 2 inches) and that appellant was about 5 feet 8 inches in height (he was actually 5 feet 8½ inches in height).

These two witnesses, and Laura Miller and William Hagerty, the other two identifying witnesses, each were in close proximity to appellant during the robbery, and each had an adequate opportunity to observe him. Miller and Hagerty identified appellant in a lineup, which was properly conducted without any suggestive features, before they saw any photographs of appellant, observed any television broadcasts, or read any newspaper accounts of the robbery. We do not consider that any pre-trial identification was impermissibly suggestive as to the other two identifying witnesses, but assuming that the issue was arguable, there was more than sufficient evidence of an independent basis for the in-court identifications to overcome such taint as there was and to support and authorize their admission into evidence.

Appellant also makes several contentions which are really directed to the believability of the identification testimony. One assertion deserves comment. Appellant states that the "credibility" of Laura Miller, who identified appellant in both lineups, "is questionable" because at the St. Louis County lineup "she also mis-identified a police officer." This is a totally unjustified accusation. At the lineup she identified appellant and a companion named Johnson. On cross-examination at trial she was asked if she also "picked out a police officer." She replied that at the lineup she was asked if she "recognized anyone else" and she pointed to another person "because I had seen him earlier that day" in the courthouse, and she was later told that he was a policeman. This does not indicate

that she "mis-identified" a police officer as one of the robbers; it indicates that she recognized the police officer as a person she had previously seen, and nothing more.

 In argument, but not in his point, appellant attacks a procedure whereby, in preparation for trial, prospective witnesses were shown photographs of appellant and other defendants by the prosecuting attorney during a reenactment of the robbery. The procedure that was followed was examined in Part V of the opinion in *State v. Hill,* supra, and it was there held that "The reenactment * * * was for the purpose of establishing how the crime occurred and the parts played by the various defendants. It was not meant for purposes of identification nor was it so used." We adopt that ruling.

Appellant's guilt was amply supported by the evidence, and we find no error prejudicial to him in any of the matters presented.

The judgment is affirmed.

SMITH, C. J., and NORWIN D. HOUSER, Special Judge, concur.