STATE of Missouri, Respondent,

v.

Louis JONES, Appellant.

No. 36112.

Missouri Court of Appeals,
St. Louis District,
Division Four.

Dec. 7, 1976.

Motion for Rehearing or Transfer
Denied Jan. 14, 1977.
Application to Transfer Denied
March 14, 1977.

William J. Shaw, Public Defender, Timothy A. Braun, Asst. Public Defender, Clayton, for appellant.

John C. Danforth, Atty. Gen., W. Mitchell Elliott, Asst. Atty. Gen., Jefferson City, for respondent.

ALDEN A. STOCKARD, Special Judge.

Appellant, Louis Jones, was convicted by a jury of assault with intent to kill with malice aforethought, and of robbery in the first degree by means of a dangerous and deadly weapon. The jury was unable to agree on the punishment and the trial court imposed a sentence of life imprisonment for each offense, the sentences to be served consecutively.

Appellant does not challenge the sufficiency of the evidence. We shall, therefore, summarize the facts which reasonably could be found by a jury.

A little after 1:00 o'clock in the morning of March 18, 1972, several young black persons, including appellant, armed with various weapons, entered a tavern named Cousin Hugo's in Maplewood, Missouri, and robbed the patrons, estimated to have been between 75 and 100 persons. During the course of the robbery a patron was shot, a barmaid, Sandra Clemens, was stabbed, and two patrons were killed, one by a stab wound and the other, an off-duty police officer, by being shot in the head from close range with a shotgun while he lay face down on the floor.

Shortly after the incident at Cousin Hugo's the police learned that Lucious Toney and appellant had been seen in the neighborhood, and Sergeant Boulch and two officers went to a house on Dumas

Street where they found Lucious Toney's mother. When she saw the police officers she became very excited and ran down the street shouting, "Lucious, Lucious, police." She stopped at a house located around the corner at 1338 Banneker Street. There the police officers spoke to Lucious Toney who gave them permission to enter. Inside the house the police found three other black persons, including appellant, various weapons, and numerous items such as billfolds, credit cards, driver licenses and purses, all of which belonged to the victims of the robbery at Cousin Hugo's.

█ Appellant's first point is that the trial court erred in admitting into evidence the in-court identifications of appellant by Sandra Clemens and Joyce Sullivan, and also the testimony by these two persons "of extra-judicial identifications" of appellant.

Sandra Clemens was employed at Cousin Hugo's. She testified at the trial that five black men entered the tavern, one of whom was appellant, and that after he stabbed a dog that was in the bar, he leaped over the counter and forced her to place money from the cash register into a bag that he had and then stabbed her in the abdomen. She made a positive in-court identification of appellant as that person. She did not view a lineup. After she was released from the hospital she was shown photographs and "the photograph of [appellant] looked familiar," but she was not able to "specifically identify him from the picture." On cross-examination appellant brought out for the first time that she was shown a "video tape" and pictures of two lineups. She did not testify that she identified appellant in the video tape showing or in the pictures.

Joyce Sullivan was a patron at Cousin Hugo's, and she testified that she saw two black men enter the front door who were immediately followed by three more black men. She positively identified appellant at the trial as the second person to enter. She also testified that she attended a lineup a few days later and that she there identified appellant as one of the persons she had seen at Cousin Hugo's.

Prior to trial appellant filed a motion to suppress testimony of identification, and after a hearing the court held that the lineups were fair, untainted and not suggestive; that the photographs of the lineups were fair and not suggestive; that there was no evidence of any taint or suggestiveness by prosecuting officials or police, and that the identification testimony of the witnesses was proper and that it had an independent source. The trial court however noted that "witness Sandra Clemmons * * * never viewed any corporeal lineups; that Clemmons was stabbed and went to the hospital; that she has never viewed [appellant] since the incident herein and may never be able to make an in-court identification; * *." The court then directed that Sandra Clemens "cannot make an in-court identification until at trial the Court conducts a further * * * hearing to determine whether [her] in-court identification is based upon a photograph of [appellant] or an independent source from [her] knowledge of what [she] saw in Cousin Hugo's." It was further directed that the prosecuting attorney and the police "not * * * show any photographs of [appellant] * * until the hearing" was held. A further hearing was held on October 2, 1973. Sandra Clemens then observed appellant in person for the first time after the incident at Cousin Hugo's, and she positively identified him as the person who stabbed her. She testified that she based her identification on her observation of him at the time of the incident at Cousin Hugo's, and her observation of his eyes and skintone. The trial court ruled that Sandra Clemens could testify to an in-court identification, thereby holding that there was an independent basis for the in-court identification.

Appellant presents a 92-page argument and cites 85 cases in his brief in support of his first point. Much of that argument appears to be directed to the issue of whether the testimony concerning identification should be believed, an issue for the jury, rather than to the legal issue of whether the testimony concerning identification was admissible.

In substance, appellant's contention is that the pretrial identification procedures were so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification and thereby tainted the in-court identifications. In *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), it was held that such a contention "must be evaluated in light of the totality of surrounding circumstances." When so viewed, the determination of whether pretrial identification was "impermissibly suggestive" is governed by three principles: (1) the presence of an independent basis of identification; (2) the absence of any suggestive influence by others; and (3) positive in-court identification. *State v. Jones*, 531 S.W.2d 67, 70 (Mo.App.1975).

We shall examine the issues pertaining to the preparation and use of the lineups. Appellant was placed in two lineups, the first being held on March 18, 1972, a few hours after he was arrested. Neither Sandra Clemens nor Joyce Sullivan viewed that lineup, and there was no testimony in this case that anyone who viewed that lineup identified appellant as one of those participating in the robberies and other offenses. A few days later on March 21 a second lineup was held. Sandra Clemens did not view this lineup, but it was on this occasion that Joyce Sullivan identified appellant. The lineup contained ten persons, all dressed the same and who were reasonably uniform in height and coloring. In *State v. Hill*, 539 S.W.2d 521 (Mo.App.1976), this court reviewed the procedures under which the lineups were held, and it ruled as follows: "The record reveals no constitutional infirmity in the conduct of the lineups." We find nothing in the record of this case that would justify a different conclusion. See also *State v. Davis*, 547 S.W.2d 482 (Mo.App. 1976).

Appellant makes much of the fact that although Sandra Clemens did not view either of the lineups, she was subsequently shown video tapes and pictures of the lineups. There is no contention that when she viewed the video tapes and looked at the pictures any improper suggestions were made to her, and we fail to see how it could be improper for her to have viewed the video tapes and pictures of the lineups when it would not have been improper for her to have viewed them in person. We also note that although it appeared to Sandra Clemens that of those persons in the lineups, appellant "most resemble[d] the person" who stabbed her, she stated that from the tapes and pictures she could not positively identify anyone. The conduct of the lineups, and the showing to Sandra Clemens of the video tapes and pictures of the lineups could not possibly have resulted in any impermissible pretrial identification procedures.

In further support of his contention that the in-court identifications were tainted by pretrial procedures, appellant relies on the fact that the prosecutor conducted a "reenactment" of the crimes at Cousin Hugo's. The propriety of such reenactment and the use of photographs in doing so was the subject of a ruling in *State v. Hill*, supra at pp. 527–528, and it was held that "The reenactment * * * was for the purpose of establishing how the crime occurred and the parts played by the various defendants. It was not meant for purposes of identification nor was it so used." We adopt by reference the ruling in the *Hill* case to the contention here made.

Appellant also argues strenuously that there was no, or perhaps an inadequate, independent basis of identification on the part of Sandra Clemens and Joyce Sullivan, but the argument is devoted only to the circumstances pertaining to Sandra Clemens. We therefore deem the contention to be abandoned as to Joyce Sullivan. The issue of whether there existed an independent basis for the in-court identification is usually presented when there is a defect in the pretrial lineup procedures, and then, as stated in *United States v. Wade*, 388 U.S. 218, 240, 87 S.Ct. 1926, 1939, 18 L.Ed.2d 1149 (1967), the prosecution should have an "opportunity to establish by clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the lineup identifica-

tion." In this case there was no defect in the lineup procedures.

We have read carefully the lengthy argument and find it replete with trivial minutae. For example, much is made of the fact that 20 months after Sandra Clemens had been stabbed she "was not sure she gave any description of the robbers" to a named police officer while being taken to the hospital, and to the fact that although she gave "some description" to police officers at the hospital the following day, "she could not remember the description." The evidence clearly shows that with favorable lighting conditions Sandra Clemens observed appellant when he entered Cousin Hugo's, and observed him as he approached the bar where she was working. She saw him stab a dog that was there and then jump over the bar to where she was standing. While in close proximity to her he asked another person where the money was, and he then forced Sandra to take money from the cash register and place it in a bag which he was carrying. "He looked at [Sandra] and [Sandra] looked at him and then he stabbed" her in the abdomen. She described him as a good looking black male with no distinguishing marks on his face and as having a "medium" voice. It was not until approximately 19 months later that she next saw appellant in person, but she then readily and positively identified him as the person who stabbed her. Although she could not identify appellant when she viewed the lineup pictures, she said that he appeared to be "familiar," and that she believed she could identify the person if she saw him in person. Sandra Clemens clearly had an adequate independent basis for her in-court identification.

We have read carefully the transcript and the briefs concerning the pretrial identification procedures, and we find no basis for appellant's contention that the procedures were impermissibly suggestive. We also find that Sandra Clemens and Joyce Sullivan (although appellant abandoned his contention as to Joyce Sullivan) had an adequate independent source to support an in-court identification. Therefore, the trial court did not err in refusing to suppress such testimony.

Appellant's second point is that the trial court erred in admitting into evidence "a picture of items in the bottom drawer of a dresser in a bathroom at 1338 Banneker, two shotgun barrels, a bandolier, a hacksaw, a .16 gauge bridge shotgun, and an unidentified man's brown leather wallet, all of which the State failed to connect in any way with the Cousin Hugo's robberies, assaults, and killings, and which highly prejudiced the defendant and inflamed the jury."

Appellant was charged by indictment with two counts of murder in the first degree, two counts of robbery in the first degree by means of a dangerous and deadly weapon, and two counts of assault with intent to kill. He was found guilty of only one count of robbery and one count of assault, but the State was entitled to offer evidence in support of all the counts of which appellant was being tried.

Appellant and three other persons were arrested at 1338 Banneker within hours after the commission of the crimes. The police were given permission to enter the house. There is no issue here concerning the legality of the search. Various items were found in the house and seized by the police, and at trial were offered in evidence by the State. Appellant contends it was error to admit the various items in evidence because they were not connected to the commission of the crimes with which he was charged and were highly prejudicial and inflammatory.

It has long been the rule that items are sufficiently connected to a defendant when they are found in the possession of his criminal associates. *State v. Cuckovich,* 485 S.W.2d 16, 23 (Mo. banc 1972). A thorough consideration was given to the issue of the admissibility of most if not all of these same items in the companion cases of *State v. Johnson,* 539 S.W.2d 493 (Mo.App.1976); and *State v. Toney,* 537 S.W.2d 586 (Mo.App.1976); and *State v. Hill,* supra. In each case it was held that the items were admissible in evidence. No factual distinction exists that would compel

or justify a different result in this case. We see no occasion to elaborate in this opinion the reasons for the results there reached. Instead, we adopt by reference the rulings in the above cited cases.

■ Appellant next asserts that he was denied due process and equal protection of law when the trial court refused his request that he be furnished at public expense a complete transcript of his previous trial which ended in a mistrial after the jury did not reach a verdict.

Appellant's first trial began October 1, 1973 and ended in a mistrial on October 13, 1973. On October 17, appellant's counsel requested the court reporter to prepare a transcript of *all* the proceedings in the first trial. The reporter immediately advised appellant's counsel that the preparation of the transcript, estimated to be 1,500 pages (the transcript in this trial exceeds 1,400 pages), prior to the setting for the second trial would be "physically impossible to accomplish." The reporter stated that if appellant's counsel wished the testimony "of perhaps three witnesses" she would try to prepare the same. On October 26, a hearing was held by the trial court on appellant's request for a free transcript. At this time appellant's counsel again requested a transcript of *all* the proceedings except he excluded the voir dire examinations, the opening statements and closing arguments, and the instructions. He particularly specified that the transcript include the testimony of Sandra Clemens at the hearing on the motion to suppress and at trial, and the testimony at the trial of Joyce Sullivan, Tom Koons and Sergeant Boulch. The court stated that the preparation of the requested transcript before December 3, the date set for trial, was impossible. Appellant's counsel admitted that he had depositions of each witness who testified at the previous trial and a transcript of the testimony of every witness who had testified at the trial of Theodore Johnson who was one of those arrested at the time appellant was arrested. The court then directed that the testimony at appellant's first trial of Sandra Clemens, Joyce Sullivan, and Thomas Koons be fur-

nished to appellant, but it denied the request in other respects "in view of the fact that depositions of all witnesses and a transcript [the Johnson trial transcript] * * containing testimony of the same witnesses in an event of the same occurrence has been made available to you." We note here that appellant made no request for a continuance so that the reporter would have time to prepare a transcript as requested, and he indicated no person by name whose testimony he wanted which was not furnished to him, unless it was that of Sergeant Boulch, but there is no contention on this appeal that any prejudice resulted from the failure to obtain that particular testimony.

Appellant relies primarily on *Britt v. North Carolina,* 404 U.S. 226, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971). In that case the petitioner was tried for murder and the first trial ended in a "hopeless deadlock." A retrial was scheduled for the following month. The petitioner filed a motion requesting a free transcript of the first trial on the basis that he was indigent. The Supreme Court of the United States stated that "*Griffin v. Illinois* [251 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956)] and its progeny establish the principle that the State must, as a matter of equal protection, provide indigent prisoners with the basic tools of an adequate defense or appeal, *when those tools are available for a price* to other prisoners. While the outer limits of that principle are not clear, there can be no doubt that the State must provide an indigent defendant with a transcript of prior proceedings when that transcript is needed for an effective defense or appeal * * *." (Italics added.)

There is no equal protection issue here. Appellant was not denied the transcript because he was indigent. See *State v. Ambus,* 522 S.W.2d 306, 310 (Mo.App.1975). He was furnished portions of the transcript for which he had expressed a particular interest, but was not furnished those portions which could not be prepared within the time available. Those portions would not have been "available for a price" to a non-indigent. The concept of equal protec-

tion, although greatly expanded in recent years, does not require the granting to an indigent accused rights or privileges not available to the non-indigent.

Appellant argues, however, that the trial court erred when it "forced" his counsel to "choose" the testimony of only three witnesses. He asserts, without setting out in what respects, that this "interfered with [his] right to control his client's defense and [it] improperly interjected the Court into the defendant's case." We find nothing in the record to the effect that the court "forced" counsel to choose the testimony of only three witnesses. It was the reporter who suggested that if appellant's counsel wished the testimony of "perhaps three witnesses" she would try to transcribe it. It was appellant's counsel who, in making his request for a transcript "of all proceedings" excluding certain portions, stated that the transcript should specifically include the testimony of four named witnesses. There is nothing in the record to indicate that if specifically requested, and the reporter could have performed the task, that the testimony of some other witness would not have been furnished.

Appellant also asserts he had "an absolute Constitutional right to the transcript * * * when his attorney requested it because the Missouri Constitution Article I, Section 14 guarantees that the courts shall be open to everyone." No cases are cited. He argues that since reporters are officers of the court and are paid a salary by the state that is "more than the average Public Defender" they should "provide transcripts of recorded proceedings upon request of counsel." We fail to see how the cited provision of the Missouri Constitution or the compensation of court reporters have any bearing whatever on appellant's right to obtain a free transcript of the proceedings of the previous trial in the circumstances of this case.

Appellant's final argument under this point is that Missouri "can show no compelling State interest for providing transcripts to guilty criminal defendants who appeal after trial or wish to challenge their pleas of guilty, while not providing a transcript to a still innocent indigent defendant who was retried after a mistrial, * * *." The immediate answer to this contention is that Missouri does not refuse to provide a free transcript of a previous trial to an indigent defendant when there is a reason to have it and when it is physically possible to provide it.

As previously noted, appellant's counsel requested a physical impossibility, but the trial court attempted to comply with his request insofar as possible under the circumstances. Appellant made no request for a delay in the second trial so that the transcript could be prepared. In meeting the problem of congested court dockets and the requirement that an accused be afforded a speedy trial, the courts are entitled to the cooperation of counsel. We gather the impression that appellant's counsel preferred to preserve a contention of error for purposes of appeal rather than cooperate with the court in obtaining those portions of the transcript for which there was a genuine need and to proceed expeditiously with the trial.

Appellant's fourth point is that the trial court abused its discretion in giving Instruction No. 22 [MAI–CR 1.10] and No. 23 [MAI–CR 4.50] "in conjunction" after the jury had begun deliberations but before they had indicated an inability to reach a verdict. He asserts that when given "in conjunction" the two instructions "were impermissibly coercive in reiterating to the jurors their duty to reach a verdict" and constituted an "impermissible intercession by the Court into the special province of the jury which caused the jury to compromise [appellant's] constitutional rights to a fair trial."

The jury began its deliberation at 2:30 o'clock in the afternoon of December 14, 1973, and recessed at 10:15 o'clock. Deliberation was resumed the next morning at 9:30 o'clock. At 12:00 o'clock noon the jury notified the court for the second time that they were "dead-locked," and for the second time requested that a transcript of the testimony of Joyce Sullivan be furnished to

them. This clearly demonstrates that appellant's assertion that the jury had not "expressed an inability to reach a verdict" is contrary to the record and totally without merit. The court advised the jury that a transcript of the testimony of Joyce Sullivan could not be given to them, and it gave to the jury in writing Instruction No. 22, which advised the jury that it was desirable that a verdict be reached, and Instruction No. 23, which advised the jury that if it found the appellant guilty as to a particular count but could not agree on the punishment the court would fix the punishment. Approximately two hours later the jury reached a verdict in which it found appellant guilty of two counts and not guilty as to the others, but it declared that it could not agree on the punishment.

This trial occurred prior to January 1, 1974, when the use of MAI–CR became mandatory, but the use of the MAI–CR forms was permissible, and what subsequently became mandatory is a reasonably good standard of what was appropriate at the time of the trial of this case.

The main thrust of appellant's argument is that it was prejudicial for the court to give the two instructions "in conjunction." He asserts that each instruction is "potentially prejudicial." He agrees, however, that when given separately "the possibility of undue prejudice is avoided," but he asserts that when given "in conjunction, the urgency of the request that a verdict be returned * * * compounded with the suggestiveness of guilt * * * encourages a jury to rush to return a guilty verdict."

■■ The use of an Instruction in the language of MAI–CR 1.10 (Instruction No. 22) has been approved prior to the mandatory use of MAI–CR. *State v. Foster,* 501 S.W.2d 33 (Mo.1973). Rule 20.02(a) now provides that it may be given, when appropriate, after extended deliberation by the jury. In this case the jury had deliberated for approximately ten hours. When a jury is unable to arrive at a verdict, it is within the discretion of the trial judge whether such an instruction should be given, and

also as to when it should be given. *State v. Jenkins,* 516 S.W.2d 522, 528 (Mo.App.1974). The nature of the case and the number of issues properly would have a bearing on when the Instruction should be given, but deliberation for ten hours in this case unquestionably meets the requirements that the deliberation be extended. See *State v. Jenkins,* supra, when the period of deliberation was three and one-half hours, and *State v. Barron,* 465 S.W.2d 523 (Mo.1971), where the period was three hours.

■ As to Instruction No. 23 in the form of MAI–CR 4.50, it does not, as appellant asserts, contain a "suggestiveness of guilt." To assert this implies a contention that jurors are not sufficiently intelligent to read the other instructions in connection with the clear and unequivocal language in Instruction No. 23 that: "If you unanimously find the defendant guilty as to a particular Count, you should fix his punishment as to that Count. If, however, after due deliberation, you find the defendant guilty as to a particular Count, but are unable to agree upon his punishment as to that Count, you will complete the verdict form so stating, and in that event the Court will fix the punishment." We find no abuse of discretion on the part of the trial court in giving either of these two instructions when it did, and we find no merit whatever in appellant's contention that giving them "in conjunction" was an abuse of discretion.

■ Appellant's fifth point is that the verdict was "legally inconsistent and ignored the instructions of the Court."

By indictment, appellant was charged with the murder of John M. Gallino (Count I), the policeman who was shot in the head with a shotgun; with the murder of John M. Hagerty (Count II), the patron who was stabbed; with an assault upon Sandra Clemens by use of a knife with intent to kill (Count III); with an assault upon Owen Kelly with a shotgun with intent to kill (Count IV); with the robbery of Francis E. Holker, doing business as Cousin Hugo's, of $1,000.00 which was in the custody of San-

dra Clemens (Count V); and with the robbery of Sherrell Hagerty (Count VI). By its verdict the jury found appellant guilty only of Counts III and V, or only those counts in which he was charged with committing an act against Sandra Clemens.

Appellant argues that a finding of not guilty of Counts I, II, IV, and VI was "a finding that [he] was not present, and therefore not one of the persons who committed the offenses connected with the robbery of Cousin Hugo's on March 18, 1972," and that this finding precluded "an inconsistent finding that [he] was present but committed only the specific crime of assault and robbery of [Sandra] Clemens." This contention is totally without merit.

■ The verdict was not inconsistent. The instructions submitting the two murder charges, the charge of assault upon Owen Kelly, and the charge of robbery of Sherrell Hagerty (the charges of which appellant was found not guilty) each required the jury to find that appellant "knowingly and with common purpose acted together with the said person who engaged in the conduct submitted in the above paragraphs." Each Instruction also contained the provision that if the jury did not find and believe from the evidence beyond a reasonable doubt "each and all of the foregoing," it "must" find appellant not guilty of the offense there submitted. However, the instructions submitting the assault upon Sandra Clemens and the robbery by taking money in the custody of Sandra Clemens respectively required a finding only that "the defendant stabbed one Sandra Clemens" and that "the defendant * * * took the property from said Sandra Clemens." Therefore, if the jury did not believe beyond a reasonable doubt that appellant "knowingly and with common purpose acted together" with the person or persons who in fact committed the offense charged, the instructions of the court told the jury that it "must" return a verdict of not guilty of the offense charged. But, in order to find that appellant committed the two offenses of which he was found guilty, there was no requirement that the jury find that

he "knowingly and with common purpose" acted with anyone, but only that he stabbed Sandra Clemens and that he took the money from her. "When a defendant is charged with committing two criminal offenses that involve different elements, a jury may find him guilty of one crime and acquit on the other charge." *State v. Thomas,* 452 S.W.2d 160, 164 (Mo.1970). The verdicts of the jury as to each count were logical and consistent, and they certainly did not indicate that the jury "ignored the instructions of the Court." Also, the verdict of not guilty of the four counts did not mean, as appellant argues, that the jury found that appellant was not present at Cousin Hugo's.

Assuming for argument purposes only that for some reason the verdicts as to the four counts and the verdict as to the two counts may be considered to be inconsistent, a reversal of the judgment of conviction is not required. *State v. Amerson,* 518 S.W.2d 29, 33 (Mo.1975). In *Dunn v. United States,* 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932), it was stated: "Consistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment * * *. That the verdict may have been the result of compromise, or of a mistake on the part of the jury, is possible. But verdicts cannot be upset by speculation or inquiry into such matters." See also *State v. Larkins,* 518 S.W.2d 131, 137 (Mo.App.1974), and the numerous cases cited in the annotation at 18 A.L.R.3d 259.

■ Appellant next asserts in his sixth point that the trial court erred "in considering appellant's alleged admission to a probation officer in sentencing [him] to a maximum sentence on [each count] because of [that] admission." He argues that he had not waived his rights against self-incrimination and did not have his attorney present during the interrogation by the probation officer.

Immediately after the jury rendered its verdict appellant requested that a presentence investigation be conducted. In the exercise of its discretion, *State v. Tettamble,* 517 S.W.2d 732 (Mo.App.1974), such in-

vestigation was ordered. At the time of allocation and sentencing the trial court noted for the record that the State Board of Probation and Parole recommended that appellant not be considered for probation, and the court then read into the record a portion of the record in which the probation officer stated that he had questioned appellant about his involvement in "this offense," and that he had stated "somewhat hesitantly" that he was with his four co-defendants at the time of the offense, that it was "a spur of the moment thing," and that "he played the part of the knife man."

The entire report is not in the record. Appellant's counsel then objected to the court "reading from that report" on the ground that "whatever statements are contained in that pre-sentence investigation would not be for public knowledge, but for the Court's consideration, and * * * any of this testimony that is read by the Court of this nature, is in the nature of hearsay, and [appellant] has [no] opportunity now that it has been made public to at least address himself to the Court to explain any of the discrepancies if there are, contained in that report, or whether or not the report is factual." The court then conducted allocation, and in the course thereof asked appellant if he had "anything to say" concerning the presentence report. Appellant replied as follows:

"Your Honor, I wasn't sure of him, or he wasn't sure of himself to come to question me about that, and I just assumed it was an investigation to bring this report back over, and to just go over it, and I refute it, whatever it was. I didn't understand. I wanted to write in my reasons. I didn't understand, and then he come back over with it for me to write on it. He said he'd have to check with the Judge."

It thus appears that appellant did have the opportunity to "address himself to the Court" and to explain any claimed discrepancies.

Subsequently, in response to a plea by appellant's counsel concerning punishment, the court announced that "probation is not being considered, partly due to this probation record and also due to the jury finding him guilty of two felonies in connection with this robbery at Cousin Hugo's and because of his involvement in that robbery."

On this appeal appellant asserts that it was error for the court to consider the portion of the presentence report to which reference is above made because he "had never waived his rights against self-incrimination under *Miranda v. Arizona*," and he "did not have his attorney present [during] the probation officer's interrogation."

Appellant requested the presentence investigation. Therefore, whatever information it contained got into the hands of the Court by reason of appellant's request. At the time of sentencing he did not object to the fact that the court had knowledge of its contents, but to the fact that by reading a portion into the record that portion had been made public, and that the information in the report was hearsay. Neither of the objections now asserted to this court on appeal were presented to the trial court. While we are convinced that appellant's point, if properly preserved for appellate review, is totally without merit, objections not presented to or expressly ruled by the trial court are not preserved for appellate review, *Federal Deposit Insurance Corporation v. Crismon,* 513 S.W.2d 305 (Mo.1974), and appellant may not alter or broaden the scope of his objection on appeal. *State v. Atkins,* 494 S.W.2d 317, 319 (Mo.1973); *State v. Larkins,* 518 S.W.2d 131, 134 (Mo. App.1974). If objection to the consideration by the court of the presentence report, or parts of it, had been made for the reasons now advanced, whether or not legally meritorious, the court may have complied with his request. The orderly trial of cases cannot permit this form of entrapment of the trial judge.

■ Appellant's final point is that the trial court erred in sentencing appellant to consecutive life terms.

At the time of the trial of this case § 546.480, RSMo 1969, required the two

sentences to be served consecutively. The trial court directed that the life sentence for the robbery and the life sentence for the assault with intent to kill be served consecutively. It may be presumed, in the absence of other reasons appearing of record, that the court did so in compliance with what was then the requirements of § 546.-480. However, in 1975 the Supreme Court of Missouri ruled § 546.480 to be unconstitutional. The trial court now has the authority to exercise judicial discretion whether to impose concurrent or consecutive sentences on the two-count conviction. Therefore, the cause must be remanded for that limited purpose.

The judgment of conviction is affirmed; the "mandatory" consecutive life sentences are set aside and the cause is remanded for the limited purpose of resentencing by the court in an exercise of discretion whether to impose the sentences in question consecutively or concurrently.

SMITH, C. J., and NORWIN D. HOUSER, Special Judge, concur.